**UNITED STATES of America**

v.

**NYNEX CORPORATION.**

**Cr. No. 90–0238 (HHG).**

United States District Court,
District of Columbia.

Feb. 16, 1993.

Michael P. Harmonis, Carl Willner, Kenneth W. Gaul, Katherine E. Brown, Antitrust Div., U.S. Dept. of Justice, Washington, DC, for U.S.

Scott W. Muller, Linda Chatman Thomsen, J. Andrew Heaton, Davis Polk & Wardwell, Washington, DC, Guy Miller Struve, Seth Richard Lesser, Davis Polk & Wardwell, New York City, for NYNEX.

## OPINION

HAROLD H. GREENE, District Judge.

Defendant NYNEX Corporation was indicted for criminal contempt under 18 U.S.C. § 401(3) for allegedly violating Section II(D)(1) of the decree entered by this Court in *United States v. American Tel. & Tel. Co.*, 552 F.Supp. 131 (D.D.C.1982).[1] After numerous pretrial motions were resolved,[2] a bench trial was conducted, and both parties thereafter submitted proposed findings of fact and conclusions of law. For the reasons set forth below, the Court concludes that NYNEX is guilty of criminal contempt.[3]

I

NYNEX, as one of the Regional Companies spun off in the divestiture of AT & T, is bound by the provisions of the decree in the case of *United States v. AT & T*, 552 F.Supp. 131 (D.D.C.1982). Pursuant to Section II(D)(1) of that decree, "no [Regional Company] shall, directly or through any affiliated enterprise ... provide ... information ser-

---

1. NYNEX does not dispute that jurisdiction and venue are proper in this Court.

2. *See United States v. NYNEX*, 781 F.Supp. 19 (D.D.C.1991); *United States v. NYNEX Corp.*, 788 F.Supp. 16 (D.D.C.1992).

3. NYNEX requested, pursuant to Federal Rule of Criminal Procedure 23(c), that the Court make separate findings on every issue and every defense. However, Rule 23(c) is satisfied by opinions which discuss dispositive facts and law in combination provided they furnish a basis for intelligent appellate review. *United States v. Pinner*, 561 F.2d 1203, 1206 (5th Cir.1977).

vices."[4] And Section IV(J) of the decree defines "information service" to mean:

the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information which may be conveyed via telecommunications....[5]

NYNEX is a Delaware corporation with its headquarters in New York City. NYNEX Development Company (Devco), a wholly-owned subsidiary of NYNEX, was charged by its parent with identifying software companies that might be suitable for acquisition by NYNEX. On April 11, 1986, NYNEX acquired Telco Research, which designed and sold various telecommunications-related software products.

As a NYNEX subsidiary, Telco was subject to NYNEX's control, exercised primarily through Victor Cunningham, Devco's Director of Business Development,[6] Gad Selig, Devco's Vice–President for Business Development, and A. Theodore Engkvist, President of Devco. After acquiring Telco, Mr. Engkvist became Telco's Chairman of the Board of Directors and Mr. Selig became a member of that Board. These new Board members actively participated in operating Telco, assisted in assimilating the newly-acquired business into NYNEX, and reviewed the business plans which NYNEX required Telco to develop and which were required to be approved by NYNEX prior to implementation. Tr. at 403–404.[7] In addition, through quarterly meetings of personnel from both companies, NYNEX oversaw Telco's business operations to ensure that they were consistent with NYNEX's corporate interest. Engkvist Deposition (3/8/88) at 117, 120–21, 126, 128–30, 138–39.

NYNEX concedes that it knew of the decree; that the information services prohibition of the decree applied to conduct that it undertook "through any affiliated enterprise"; that Telco, as a wholly-owned subsidiary was an "affiliated enterprise"; and that the acquisition of Telco presented potential decree issues. *See* NYNEX Corporation's Proposed Findings of Fact and Conclusions of Law at 2–3; Section II(D), Section IV(C).

Moreover, NYNEX unquestionably understood that a crucial component of its responsibilities was to ensure Telco's decree compliance. The decree imposes an affirmative obligation on the Regional Companies to guarantee that all subsidiaries and their employees carry out the terms of the decree. *See* Section III. NYNEX's officers recognized that Telco was not sufficiently well-versed in the requirements of the decree to locate decree trouble spots, and that it was NYNEX's responsibility to identify and solve Telco's decree obligations. Hearity Deposition (2/14/88) at 169–70; Selig Deposition (1/22/88) at 166; Cunningham Deposition (11/2/87) (Raff.) at 77–79.

Indeed, prior to the purchase, NYNEX undertook a legal review for potential decree issues. As evidence that it understood its decree responsibilities, NYNEX determined that the so-called Tariff Library service being offered by Telco constituted a clear decree violation, and accordingly it ordered Telco to discontinue this service. However, for reasons explained below, NYNEX also was obligated to discontinue, or at least substan-

---

4. The information services restriction was eliminated by the Court in 1991, long after the events which gave rise to this contempt action. *United States v. Western Electric Co.*, 767 F.Supp. 308 (D.D.C.1991).

5. There is an exception which provides that "information service" does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.

6. Among the relevant personnel are: (1) A. Theodore Engkvist, President of NYNEX Development Company and later Chairman of the Board of Telco Research; (2) Gerald Murray, General So-

licitor of NYNEX; (3) Thomas J. Hearity, a NYNEX attorney working under Mr. Murray; (4) Gad Selig, Vice–President of Devco and later a member of Telco's Board of Directors; (5) Victor T. Cunningham, Director of Business Development at Devco; (6) James Jewett, Founder and President of Telco, and later Vice–Chairman of the Board of Telco Research; (7) William J. Tallent, a Senior Vice President of Telco, and later its President; (8) Robert Waterman, at that time Telco's Vice–President for Direct Sales.

7. The trial transcript is denoted as "Tr." and depositions taken in a case brought by an individual against the corporation are indicated by "Raff. ___."

tially to modify, Telco's MCI service bureau (*see infra*) because this, too, was a prohibited information service. As now will be seen, it is clear that NYNEX failed to do so.

The information service at issue is Telco's contract with MCI Communications Corp. (MCI) which allowed MCI–Midwest employees to access Telco's computer facilities and software at Telco's premises in Nashville, Tennessee via the telephone lines.[8] It is this service that is known as the "MCI service bureau." Pursuant to the contract, Telco licensed MCI to use Telco's "Voice Network Architect" computer program on a computer system located at Telco's offices which, at the time of the acquisition, was a Digital Equipment Corp. MicroVAX II ("MicroVAX") computer. Telco owned the MicroVAX, but the computer's capacity was used by MCI. MCI used the service bureau to design long-distance networks for MCI's customers ("network design studies").

The network design studies were performed by means of the following steps: (1) MCI mailed computer tapes containing customer telephone calling pattern data to Telco; (2) Telco loaded the data onto its computers and, if necessary, converted them into a format readable by the Voice Network Architect software; (3) Telco electronically transferred the data to the MicroVAX computer where they were stored; (4) the MCI employee performing the network design study gained access to the MicroVAX computer via telephone lines and generated a design for a telephone network and (6) either Telco printed and mailed the results to MCI or the MCI employee retrieved the final study results by phone.

The MCI service bureau continued in operation for ten months after NYNEX's acquisition of Telco. It was terminated, on February 18, 1987, only after NYNEX learned that it was being investigated with respect thereto by the Justice Department. The indictment charges that the MCI service bureau constituted the provision of an "information service," which, as noted, Regional Companies such as NYNEX were strictly prohibited from providing (at the time of the conduct in question[9]) under Section II(D) of the decree.

## II

NYNEX raises three defenses. First, it is claimed that the MCI service bureau was not an information service, but was merely the lease of customer premises equipment plus software ("CPE plus software"). Second, even if the arrangement was an information service, NYNEX's officers did not know that it was and were not advised differently. Third, in any event, any violation of the decree was not willful. Each of these defenses is addressed below.

■ NYNEX's characterization of the MCI Service bureau as a lease of CPE plus software coupled with various "ancillary activities" is incorrect. Under the NYNEX theory, the agreement between Telco and MCI was not for the provision of an information service, but instead it merely arranged for the lease of a MicroVAX computer and related software dedicated to MCI's use.

Central to the Court's rejection of this defense is the difference in carrier involvement between a lease of CPE and the provision of an information service. As defined in the decree, CPE means "equipment employed on the premises of a person (other than a carrier) to originate, route, or terminate telecommunications, but does not include equipment used to multiplex, maintain, or terminate access lines." Section IV(E). In essence, CPE is the lease or sale by a Regional Company of telephone equipment, such as telephone headsets, switching systems, or, perhaps, a computer, to be used on the customer's premises. While the Regional Company may retain ultimate ownership,

8. In April 1986, after the acquisition, Telco and MCI executed an "Interim Agreement" which expanded the MCI service bureau to permit other MCI divisions to access the service. Pursuant to this agreement, the MCI Pacific Division performed a major study (the "Rockwell Study") and a number of other MCI divisions were authorized to carry out other network design studies.

Government Exhibits 9 and 24. The indictment also charges violations of the decree under the Interim Agreement.

9. *See United States v. Western Electric Co.,* 767 F.Supp. 308 (D.D.C.1991) (lifting the information services restriction).

day-to-day control of the equipment is in the hands of the customer. In contrast, as detailed below, an "information service" contemplates a much more active and interactive carrier role, such as the manipulation of data.

As an initial matter, the Court notes that there is no contemporaneous evidence whatever that NYNEX believed the service to be CPE plus software. In fact, the evidence demonstrates that NYNEX officers considered and rejected this characterization of the service. When Cunningham explained the service bureau to him, Hearity clearly stated that he did not believe that the contract could be characterized as being a lease agreement. Hearity Deposition (2/14/88) at 147. When evaluating how to alter the service bureau to legalize it under the decree, Cunningham suggested that the service bureau be modified into a lease agreement. Government Exhibit 56 at ONT 1890. Obviously, had NYNEX truly believed that the existing arrangement was a lease of CPE, alteration of the service bureau to transform it into a lease would have been unnecessary.

More crucially, the service bureau simply was not customer premises equipment. Contrary to NYNEX's contention, MCI did not have exclusive control, either physical or constructive, over the MicroVAX—as it would have had to have if this was merely a lease of CPE. The computer was always owned by Telco, not MCI, and was located on the Telco premises. Telco employees acted as systems managers and otherwise controlled the MicroVAX. MCI's computer access was controlled by Telco, which had the sole power to add or delete passwords. Furthermore, the agreement limited MCI's use of the service bureau to using the Telco Research network architect program.

Nor was the MicroVAX dedicated to MCI. The MCI–Midwest Agreement granted Telco Research complete discretion to choose the type of computer processor to be used by MCI as part of the MCI service bureau. Telco retained authority to transfer MCI's computer access to another computer "at any time during the term of the agreement." MCI–Midwest Agreement ¶ 1.2.3. In combination, this absolute discretion and the almost total lack of specificity in the contract as to the type, specifications, and capabilities of the computer to be used by MCI, the day-to-day involvement of Telco in operating the computer, as well as the fact that MCI never had physical control of the MicroVAX is inconsistent with NYNEX's stance that the arrangement was a computer lease.[10]

By contrast, the MCI service bureau falls squarely within the definition of an information service. Indeed, the Competitive Impact Statement filed by the Department of Justice in connection with the AT & T break-up clearly stated that "the offering to customers of a service that provided voice or data storage, as part of the service offering, would be an information service." 47 Fed. Reg. 7170, 7176 (Feb. 17, 1982). This was reiterated in the Department's Response to Public Comments on the proposed decree when it again explained that the Regional Companies would be prohibited from providing services involving "a change in the form o[r] content" of information or that includes voice or data storage, unless the storage or processing functions are "inherent in the provision of telecommunications services within an exchange." 47 Fed.Reg. 23320, 23334 (May 27, 1982). And in approving the decree, this Court gave similar direction and specifically cited data processing as a potentially prohibited information service. *United States v. American Tel. & Tel. Co.,* 552 F.Supp. at 179.[11] NYNEX's own Antitrust Education Handbook, page 16, states that

10. In fact, the MCI–Midwest Agreement does not even specify that Telco must provide a MicroVAX II. The only contractual reference to a MicroVAX is a limitation on MCI's purchase option.

11. NYNEX argues that later documents authored by the Department of Justice blurred the meaning of information service. However, because the language of the decree unambiguously prohibits the precise activity at issue here, the meaning of the decree's prohibitions is determined directly from its text and the contemporaneous understandings of its purposes. *United States v. Western Electric Co.,* 894 F.2d 1387, 1390 (D.C.Cir.1990). Furthermore, this argument ignores NYNEX's actual knowledge. Even if there were no bright line between CPE and an information service, that would not render irrelevant the fact that NYNEX actually knew that it was violating the decree.

"an information service basically involves an interaction with a data base via telecommunications where the customer obtains information different than the information transmitted." The MCI service bureau fits these descriptions precisely.

The MicroVAX computer and Telco Research's network design software were only two of many pieces of the integrated service bureau available to MCI and, viewed in its entirety, the package of services provided by NYNEX to MCI can only be viewed as a prohibited information service. As discussed above, Telco provided MCI with more than merely a computer. In addition to the computer and the software, the MCI service bureau also granted MCI a license for multiple MCI employees to use Telco's Voice Network Architect Program, dedicated computer capacity of Telco's choosing, and on Telco's premises for the purpose of running the network design software; provided for use of all equipment necessary to allow MCI employees to access the service bureau by dialing into Telco over telephone lines, and use of all equipment needed to load, process, transfer and make available both the data MCI employees wished to process and to retrieve the final product of that processing; and made available Telco Research employees to control, operate, and provide all the equipment function as needed on a daily basis and to advise and assist MCI employees in their dial-in use of the service bureau. Characterization of this transaction, in which Telco offered "a capacity for generating, acquiring, storing, transforming, processing, retrieving, [and] making available information which may be conveyed via telecommunications" as a mere equipment lease plus software is entirely without merit. Section IV.

In essence, NYNEX argues that because the components of the service could have been provided separately—that is, that the computer itself, for example, could be leased or sold—and because all computers are capable of processing information, the entire service is legal. Such an interpretation would make the information services provision a nullity. Neither the Court nor the Department of Justice has ever taken the position in the many interpretations of the decree during the last eleven years that a service clearly constituting a prohibited activity is nonetheless permitted if the individual components may validly be provided separately.

The testimony of NYNEX's expert witness, Dr. Peter Huber, is not to the contrary.[12] Although Dr. Huber believed that, from an engineering perspective, the MCI service bureau was not an information service, it is a comparison of a service to Section IV(J)'s definition which determines whether the activity is an information service. *See, e.g., United States v. Western Electric Co.,* 578 F.Supp. 658, 659 (D.D.C.1983). Indeed, Dr. Huber acknowledged that he had "no doubt" that the shared resources "are precisely the kinds of features that do make this begin to look more like an information service," Tr. at 383, and further, that he advised the Department of Justice that based on his assessment of the service bureau, the Department "had a fair chance of having this Court crucify NYNEX." Tr. at 379. Finally, Dr. Huber testified that had he been hired as counsel for NYNEX at the time, he would have advised the company that continuation of the service bureau was a "disaster" that NYNEX should not "touch ... under any circumstances." Tr. at 381, 382, 383–85.

Measured against the decree language, Telco supplied MCI with all services necessary for "generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information which may be conveyed via telecommunications" itself as an integrated package without conveying ownership or control of the system to MCI and without requiring MCI to acquire the additional facilities necessary to make the system work. Section IV(J). This, then, can only be construed as the provision of an information service.

### III

In order to find that NYNEX committed criminal contempt of this Court's decree, the government must prove beyond a

---

12. In a bench trial, the decision to accept or reject expert testimony is entirely within the Court's discretion. *United States v. Haldeman,* 559 F.2d 31, 64 n. 43 (D.C.Cir.1976).

reasonable doubt the following elements: (1) that a clear and specific court order—here, the decree—existed; (2) that NYNEX had knowledge of that order; (3) that NYNEX violated the order; and (4) that NYNEX's violation was willful. *See, e.g., DeVaughn v. District of Columbia,* 628 F.2d 205, 207 (D.C.Cir.1980) (requirement of deliberate or reckless disregard for court order); *Douglass v. First Nat. Rlty. Corp.,* 543 F.2d 894, 897 (D.C.Cir.1976); *In re Economou,* 645 F.Supp. 1055, 1057 (S.D.N.Y.1986), *aff'd in relevant part and dismissed in part sub nom., SEC v. American Board of Trade, Inc.* 830 F.2d 431 (2d Cir.1987). NYNEX may be held criminally liable for the acts of its employees as well as those of Telco employees. *See United States v. Twentieth Century Fox Film Corp.,* 882 F.2d 656, 660 (2d Cir.1989); *see also, United States v. NYNEX,* 788 F.Supp. 16 (D.D.C.1992) (discussion of relevant case law and decree provisions).

■ As stated above, NYNEX does not dispute that it knew of the decree in the *AT & T* case and the information services provision. The defense is that the NYNEX managers were unaware that the service bureau violated the decree. NYNEX may be convicted if it "knew or should have known" its legal obligations. *See United States v. NYNEX,* 788 F.Supp. 16, 20 (D.D.C.1992). The Court finds that the evidence is overwhelming not only that NYNEX "should have known," but also that key NYNEX managers clearly knew that the MCI service bureau was an information service. Moreover, their knowledge tends to prove the clarity of the decree.

Gad Selig knew that NYNEX was violating the decree, and he did not, as NYNEX asserts, in this respect confuse the Tariff Library and the MCI service bureau. While the two services are similar, Selig understood that they were distinct services and that both violated the decree. Selig unambiguously stated that there were "two separate issues, one was the usage of the Tariff Library . . .

and the other piece of the issue was the MCI issue . . . ." Selig Deposition (12/7/87) (Raff.) at 121–124. To the extent that Selig failed to differentiate between the two services, it was because both were "generic on-line services," that he lumped together when speaking. "As soon as [he] heard for the first time, on-line services, that was sufficient for [him] to say [NYNEX] can't do those things." Selig Deposition (1/22/88) at 83–84, 121.

In fact, the similarity between the two information services supports the government's contention that NYNEX knew that the service bureau was illegal. NYNEX quickly stopped offering the less profitable Tariff Library so as not to violate the decree, but it choose not to discontinue the service bureau even though it was similar in design to the Tariff Library. And most importantly, Selig repeatedly testified that he believed that the service bureau violated the decree. Selig Deposition (1/22/88) at 32–34, 50–51, 61, 73–74, 122–23, 161–62, 176, 180–82.[13]

Both Hearity and Cunningham also knew or should have known that the service bureau was an information service prohibited by the decree. Hearity repeatedly stated that NYNEX's operation of the MCI service bureau was "sailing too close to the wind." Hearity Deposition (2/14/88) at 147, 148, 151. The only reason Hearity gave for not definitively concluding that the MCI service bureau was a prohibited activity was that he was uncertain who owned the equipment. He was aware that "if Telco had been the owner, the undisputed owner of that computer, then Telco would have been providing an information service." Hearity Deposition (1/15/88) at 201. Of course, Telco was the undisputed owner of the computer.

Moreover, both Selig and Cunningham testified that Hearity informed them that the activity was an information service and illegal under the decree. Selig Deposition (1/22/88) at 50–51, 61. In addition, Hearity proposed to Cunningham that ownership of the com-

---

13. When asked whether in 1985 Hearity told Selig that the service bureau "was an information service prohibited by the decree," Selig responded: "Yes. I don't know if he used those words but that was the general theme." Selig Deposition (1/22/88) at 50–51. Later Hearity told Selig that "the way the service [bureau] was at the time, it could not be performed legally under the MFJ restriction." Selig Deposition (1/22/88) at 61. Selig advised Telco, after the acquisition, that the service bureau had to be terminated. Selig Deposition (1/22/88) at 153.

puter be transferred to MCI. Hearity Deposition (12/10/87) at 48. Absent a belief that the service was an information service, there would have been no reason for Hearity to propose such a transfer.

Given that Cunningham conceded that Hearity told him that the service bureau constituted a violation, the Court concludes that Cunningham also knew. Cunningham Deposition (1/20/88) at 119. In fact, he also so informed several other NYNEX and Telco employees. Cunningham Deposition (1/20/88) at 113–15, 139–44, 191. Furthermore, Cunningham testified that he told Waterman and perhaps William Tallent to pursue changing the ownership of the computer. Cunningham Deposition (1/20/88) at 137, 139.

Discussions with Department of Justice personnel underlined NYNEX's understanding that operation of the MCI service bureau was a decree violation. Thomas Hearity contacted a Department of Justice attorney, Michael Altschul, to seek advice about the arrangement prior to the commencement of any government investigation. Hearity Deposition (1/15/88) at 234–40; Engkvist Deposition (3/8/88) at 86–88, 95. According to Hearity, Altschul expressed concern about the MCI arrangement but did not definitively advise Hearity that it constituted a prohibited information service or that the arrangement should be immediately terminated. However, Hearity had told Altschul that NYNEX was "in the process of transferring the computer to MCI," and he wondered whether the computer could be left on Telco's premises. Altschul responded that to comply with the decree, NYNEX would have both to transfer ownership and to move the computer off Telco's property. Hearity Deposition (1/15/88) at 236–37; Hearity Deposition (12/10/87) (Raff.) at 53. In short, it is apparent that Altschul made clear that the MCI service bureau would have to be substantially altered to be brought into compliance with the decree. Still NYNEX did nothing.

 Finally, if NYNEX had any doubt about the decree requirements, it had an obligation to petition the Court for an explanation. *See* Section VII. The Regional Companies have not been reluctant to contact this Court many times on other decree matters.

The Court concludes that NYNEX should have known and did know that continued operation of the MCI service bureau violated the decree.

## IV

 Finally, NYNEX asserts that even if there was a decree violation, it was not willful. The Court disagrees and finds willfulness beyond a reasonable doubt.

 NYNEX acted with willful intent if (1) it knew or should have known its obligations under the decree, and (2) it deliberately or recklessly violated the decree. *United States v. Greyhound Corp.*, 508 F.2d 529, 532 (7th Cir.1974). As explained above, NYNEX not only should have known its decree responsibilities, but in fact actually knew them.

 Turning to the second requirement, deliberate or reckless violation, the Court notes that Section III of the decree imposed on NYNEX a duty to ensure that its subsidiaries followed the strictures of the decree. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771–72, 104 S.Ct. 2731, 2741–42, 81 L.Ed.2d 628 (1984). Section III explicitly declares the decree to be binding upon the "affiliates" of each Regional Company, and each such company must "ensur[e] that the provisions of this Modification of Final Judgment are carried out."[14] Willful intent constituting criminal contempt exists where corporate officials bearing an affirmative obligation remain inert. *In re Dolcin Corp.*, 247 F.2d 524, 534 (D.C.Cir.1956). The testimony in this case shows a pattern not only of inaction or an inadvertent oversight in the face of an affirmative obligation but of a conscious choice not to comply with the decree.

Moreover, NYNEX had strong economic motives not to discontinue the MCI service

---

14. It is undisputed that a corporation can be held criminally liable for the acts of its agents.

*United States v. A & P Trucking Co.*, 358 U.S. 121, 125, 79 S.Ct. 203, 206, 3 L.Ed.2d 165 (1958).

bureau. NYNEX points to the fact that it cancelled the Tariff Library as proof that it made a good faith attempt to comply with the decree. However, NYNEX employees were aware that the Tariff Library, unlike the MCI service bureau, was not a financial success. Selig Deposition (1/22/88) at 33, 73–74; Hearity Deposition (1/15/88) at 244. Further, NYNEX knew that MCI was an extremely important Telco customer. Selig Deposition (1/22/88) at 48–49. NYNEX employees repeatedly emphasized their hesitancy to terminate the agreement and injure the MCI—Telco relationship. Selig Deposition (1/22/88) 73–74, 113–14. Termination of the Tariff Library, by itself, therefore does little to counter the bulk of the evidence indicating that NYNEX knew its legal responsibilities and failed to comply with them.

■ Willful intent also can be shown by recklessness. *Sykes v. United States,* 444 F.2d 928, 930 (D.C.Cir.1971). The record is replete with proof that, as early as the fall of 1985, NYNEX officials were aware that the MCI service bureau presented decree problems. While NYNEX employees continued to discuss the potential violation, this produced only delay, not a remedy. On April 17, 1986, Steve Waterman, an employee of Telco, sent Selig a letter in which he explained that the MCI service bureau was ongoing. The letter was forwarded by Selig to Cunningham along with instructions that he address the problem.[15] Selig Deposition (1/22/88) at 170–72. Selig never followed up to ensure that Telco was brought into compliance with the decree. Selig Deposition (1/22/88) at 162–63, 167, 180–181, 186–87, 196–97.

After receiving the April 17 letter, Cunningham initiated several conversations concerning the method for bringing the MCI service bureau into compliance. Cunningham Deposition (1/20/88) at 116–17, 138–141. However, Cunningham was all talk and no

action. At no time did he take any affirmative steps to bring Telco into compliance.

To the contrary, Cunningham actively maneuvered to avoid ending the service bureau. In preparing Steve Waterman for a conversation with Hearity, Cunningham instructed Waterman "not to give too much away" and not to mention certain issues relating to the MCI service bureau to Hearity. Specifically, Waterman was cautioned not to use the word "timeshare" or reveal that, on at least one occasion, Telco had itself performed a study for MCI. Government Exhibit 56 at ONT 1890–91, 1893. Cunningham was deliberately evasive with Hearity, leading him to believe that the necessary changes were being made, in order to permit the MCI service bureau to continue operating until it was transferred to MCI. Government Exhibit 56 at ONT 1891–1893.

To be sure, discussions were held with regard to modification of the NYNEX service bureau. NYNEX made efforts to identify possible decree issues prior to the acquisition of Telco Research and to inform Telco executives of the necessity of complying with the decree. *See, e.g.,* Jewett Deposition (12/3/87) at 79–80; Tallent Deposition (10/26/87) at 31; Hearity Deposition (1/14/88) at 30–31, 35–36; Selig Deposition (1/22/88) at 46–48, 55. Hearity told Cunningham and Selig to modify the service. Selig told Cunningham to change the service, and Cunningham told Waterman to make the changes. However, NYNEX has not confronted the fact that the changes were not made, and, some ten months after the acquisition of Telco, the MCI service bureau continued to operate as before. NYNEX cannot insulate itself from its responsibilities under the decree by creating a merry-go-round in which its employees continuously delegate decree responsibility. Eventually, responsibility for ensuring that the decree is complied with must rest somewhere.[16] Accordingly, the Court finds that

---

15. Selig also received a copy of a Telco Research memorandum dated May 13, 1986 that described the MCI service bureau as a continuing service. *See* Selig Deposition (12/7/87) (Raff.) at 53–55.

16. Nor can that resting place be on Telco's shoulders. As NYNEX has conceded, it bore the ultimate responsibility for ensuring decree com-

pliance. The Court also rejects any defense that NYNEX was not reckless because it believed Telco was discontinuing the service. Not only did key NYNEX officials know that the service bureau continued to operate, Selig Deposition (1/22/88) at 161–162, 180–181, but, in addition, NYNEX supplied Telco with copies of and training about the decree only after it learned of the

the failure to comply resulted from NYNEX's deliberate or reckless disregard of its affirmative obligations under the decree.

## V

On the basis and for the reasons stated, the Court finds that the United States has proved beyond a reasonable doubt that: (1) a clear and specific court decree existed; (2) NYNEX had knowledge of that decree; (3) NYNEX violated the decree; and (4) NYNEX's violation was willful. Accordingly, the Court finds NYNEX guilty of criminal contempt of this Court and of a violation of the decree.

## VI

■ The Court must now consider what fine should be imposed for the contempt. The Department of Justice has asked for a fine of $1 million. While this would appear at first blush to be a very large penalty, the Court is persuaded that such an amount is appropriate.

■ If penalties in this type of situation are to have a real effect, if they are not to be regarded as mere license fees for illegal conduct, there must be a relationship between the penalties, on the one hand, and the violation and the offender's income, capital, or both, on the other. This obviously is not always possible as, for example, where a statute sets a maximum financial fine for a particular violation. But where there is no such specific limitation, it is not only appropriate but it is fundamentally fair to take into account the impact or lack of impact of the penalty on that offender, if only to provide a suitable deterrent.

So here. If contempt of court and the violation of decrees is to be deterred for the future, the fine must be such that the offender and others will notice its imposition and will take it into account when considering future violations. As the Court previously explained, a $1 million fine would "constitute one-tenth of one percent of NYNEX's aver-

age annual net income of over $1 billion. Such a fine would barely scratch the surface of NYNEX's considerable financial resources." *United States v. NYNEX*, 781 F.Supp. 19, 26–28 (D.D.C.1991).[17]

The fine for NYNEX's criminal contempt is hereby fixed at $1 million.

Department of Justice investigation. Government Exhibits 39 at A2, 99 at 1–2.

**17.** NYNEX reported net income totalling $3.4 billion for 1987 through 1989. The corporation's

income for the first quarter of 1990 was $291 million.