UNITED STATES of America, appellee,

v.

NYNEX CORPORATION, appellant.

No. 93–3019.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 15, 1993.

Decided Nov. 12, 1993.

Guy M. Struve, New York City, argued the cause, for appellant. With him on the briefs were Scott W. Muller, Linda Chatman Thomsen, J. Andrew Heaton and Seth Richard Lesser, Washington, DC.

Nancy C. Garrison, Atty., U.S. Dept. of Justice, Washington, DC, argued the cause, for appellee. With her on the brief were Anne K. Bingaman, John J. Powers, III, Constance K. Robinson and Carl Willner, Attys., U.S. Dept. of Justice, Washington, DC.

Before: EDWARDS, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

Under the so-called "AT & T Consent Decree," a number of Regional Companies were spun off in the divestiture of the American Telephone and Telegraph Company. *See United States v. AT & T*, 552 F.Supp. 131,

226–34 (D.D.C.1982) (containing the "modification of final judgment" with respect to AT & T's reorganization). Pursuant to section II(D)(1) of the Consent Decree, Regional Companies were prohibited, directly or through any affiliated enterprise, from providing "information services."[1] 552 F.Supp. at 227. Section IV(J) of the Consent Decree defined "information service" to mean:

the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information which may be conveyed via telecommunications.

*Id.* at 229. Under this provision, an "information service" did not include "any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service." *Id.* For purposes of this case, however, the most important exception to section II(D) was found in section VIII(A) of the Consent Decree, which provided that, "[n]otwithstanding the provisions of section II(D)(2), [Regional Companies] shall be permitted to provide, but not manufacture, customer premises equipment." *Id.* at 231.[2]

NYNEX Corporation was one of the Regional Companies created at the occurrence of the divestiture of AT & T. Thus, under the terms of the Consent Decree, NYNEX is a Bell Operating Company ("BOC") fully subject to the terms of the Decree. *See* section IV(C) of the Consent Decree, 552 F.Supp. at 228. On May 31, 1990, NYNEX was indicted for criminal contempt, under 18 U.S.C. § 401(3) (1988), for allegedly providing "information services" through a subsidiary, Telco Research Corporation ("Telco"), to MCI Communications Corporation ("MCI") in violation of section II(D)(1) of the Consent Decree. NYNEX requested a jury trial, but this request was denied by the District Court. Following a four-day trial, the District Court judge found NYNEX guilty of criminal contempt for willfully violating the proscription against "information

services." The District Court then imposed a fine of one-million dollars ($1,000,000.00). *United States v. NYNEX Corp.*, 814 F.Supp. 133 (D.D.C.1993). NYNEX now appeals from the verdict and judgment of the District Court.

On appeal, NYNEX raises a number of challenges to its conviction, including a significant objection to the District Court's denial of the request for a jury trial. We need not reach most of the issues that have been raised, however, for we find one to be dispositive. In our view, the record does not substantiate the District Court's finding that the Consent Decree's prohibition against information services was sufficiently clear or specific to sustain a conviction for criminal contempt. Relying solely on that ground, we reverse.

## I. BACKGROUND

In April 1986, NYNEX acquired Telco. Telco is a company that provides telecommunications-related products and services. At the time of acquisition, Telco was providing MCI with an interactive remote-access data processing service (the "MCI service bureau") pursuant to a contract entered into between Telco and MCI in 1985. *See* Master Agreement for Software License, Maintenance & Enhancement, and Equipment Purchase for Computer Software and/or Hardware, *reprinted in* Joint Appendix ("J.A.") 489. As part of the agreement, Telco licensed MCI to use Telco's "Voice Network Architect" computer program on a Micro-VAX computer owned by Telco and housed on its premises in Nashville, Tennessee. MCI used the service to conduct long distance network design studies. J.A. 487–510.

The network design work was conducted in four steps. MCI would begin by mailing computer tapes containing customer telephone calling pattern data to Telco. Upon receipt of this information, Telco employees would load the data onto its computer and, if

---

1. The information services restriction was eliminated in 1991. *United States v. Western Elec. Co.*, 767 F.Supp. 308, 327 (D.D.C.1991).

2. The now obsolete subsection II(D)(2) had provided that no Regional Company shall "manufac-

ture or provide telecommunications products or customer premises equipment (except for provision of customer premises equipment for emergency services)...." 552 F.Supp. at 227.

necessary, convert the information into a format which could be read by the Telco software. The data was then transferred to the MicroVAX computer where it was stored. Following transfer of the converted data, MCI personnel could perform network studies by accessing the MicroVAX computer via phone lines. The results were either mailed to MCI or retrieved by MCI via telephone.

Two employees of NYNEX Development Company (a wholly-owned subsidiary of NYNEX)—Gad Selig and Victor Cunningham—brought the MCI service bureau to the attention of Thomas Hearity, a lawyer in the NYNEX legal department. Hearity, in turn, discussed the matter with Gerald Murray, the senior antitrust lawyer at NYNEX. According to NYNEX, Hearity and Murray initially concluded that the MCI service bureau could be defended as customer premises equipment ("CPE") under section VIII(A) of the Consent Decree.

After further consideration, NYNEX officials concluded that the MCI service bureau might be prohibited by the Consent Decree, and decided to take steps to transfer legal title and possession of the computer in order to remove any doubt about the service's legality. In conjunction with its decision to make these changes, NYNEX contacted Michael Altschul, a Department of Justice ("DOJ") Antitrust Division lawyer. Altschul stated that if both the title and the location of the computer were changed, it was difficult to see how anyone could charge NYNEX with providing an information service; but, in Altschul's view, if the location of the computer was unchanged, the MCI service bureau would be more susceptible to being challenged. Deposition of Thomas Hearity, *reprinted in* J.A. 398, 408.

The District Court found that Cunningham, Selig, and Hearity knew or should have known that the MCI service bureau violated the Decree, and that, despite this knowledge, they nevertheless continued to operate the service. *NYNEX,* 814 F.Supp. at 139–40. In support of its conclusion, the District Court found that Hearity informed both Selig and Cunningham that the MCI service bureau was an information service and illegal under the Consent Decree, and that Cun-

ningham so informed other NYNEX and Telco employees. *Id.* The trial judge found it significant that, although the three NYNEX officials discussed possible modifications, they never took affirmative steps to insure that the problem was corrected. *NYNEX,* 814 F.Supp. at 141.

On May 31, 1990, NYNEX was indicted for criminal contempt in violation of 18 U.S.C. § 401(3) (1988). NYNEX's request for a jury trial was denied. A bench trial was conducted from April 6 through April 9, 1992. On February 16, 1993, the District Court convicted NYNEX of criminal contempt for willfully violating section II(D)(1) of the Consent Decree and imposed a fine of $1,000,000, as requested by the Government.

## II. DISCUSSION

 There are three essential elements of criminal contempt under 18 U.S.C. § 401(3): (1) there must be a violation (2) of a clear and reasonably specific order of the court, and (3) the violation must have been willful. *United States v. Turner,* 812 F.2d 1552, 1563 (11th Cir.1987). The Government carries the burden of proof on each of these elements, and the evidence must be sufficient to establish guilt beyond a reasonable doubt. *Id.* (citing *Michaelson v. United States ex rel. Chicago, St. Paul, Minneapolis & Omaha Railway Co.,* 266 U.S. 42, 66, 45 S.Ct. 18, 20, 69 L.Ed. 162 (1924)).

 From our vantage point, the heart of the problem in this case is that the District Court apparently assumed that, because several NYNEX officials feared that the MCI service bureau might be a prohibited information service, the Consent Decree was undoubtedly clear with respect to the question at issue. *See NYNEX,* 814 F.Supp. at 139. In other words, the District Court seemed to think that if NYNEX officials acted *willfully* they necessarily *violated a clear* order of the court. This reasoning improperly conflates the elements of criminal contempt, and it unacceptably alters the Government's burden of proof.

In a case such as this, the Government must prove each and every element of the offense, and "'contempt will lie only if the

putative contemnor has violated an order that is clear and unambiguous....'" *Armstrong v. Executive Office of the President, Office of Admin.*, 1 F.3d 1274, 1289 (D.C.Cir. 1993) (quoting *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 16 (1st Cir.1991)). That NYNEX may have acted willfully satisfies one element of criminal contempt, but cannot relieve the Government of its obligation to prove each of the remaining elements. *See Turner*, 812 F.2d at 1568 ("In the case of a crime consisting of three essential elements, of which wilfulness is third, a substantially supported finding of wilfulness is insufficient to support a conviction if substantial evidence is absent as to either or both of the first and second essential elements."). We find insufficient evidence to support the District Court's conclusion that the clarity element was proven beyond a reasonable doubt.

All parties agree that, under the Consent Decree, "information services" and "CPE" substantially overlapped. On the one hand, section II(D)(1) prohibited BOCs from providing information services. At the same time, however, section VIII(A) expressly authorized BOCs, such as NYNEX, to provide CPE. Dr. Peter Huber, who was certified as an expert for NYNEX, testified that at the poles the distinction between an information service and CPE is clear, but that there was a substantial area in the middle "where equipment becomes service ... [and] where service becomes equipment." J.A. 207. Dr. Huber suggested that a paradigm information service would be a powerful central computer being accessed by multiple users, usually on an interactive, time-sensitive basis. J.A. 207–08. In contrast, Dr. Huber opined that the MCI service bureau did not "look, taste, smell, or feel ... like an information service, and [he had] been using them for 22 years." J.A. 218.

Our review of the record, as well as the Government's inability to squarely explain what made the MCI service bureau an information service rather than CPE, convinces us that the service Telco provided was not clearly proscribed by the Consent Decree. We have no doubt that the MCI service bureau was, *in part,* an information service. However, this alone is insufficient to find

that NYNEX violated a *clear and specific* prohibition in the decree. The critical question is whether the MCI service bureau could be characterized as CPE (either in whole or in part), and thus found to be either permitted under section VIII(A) or not clearly proscribed by section II(D)(1).

Foremost among the evidence demonstrating the Consent Decree's lack of clarity as applied to the MCI service bureau is the Government's own inability to rationally differentiate between an information service and CPE. Indeed, in 1987, when DOJ submitted its Triennial Review to the District Court, the Government conceded the ambiguity generated by the overlap of sections II(D) and VIII(A):

> There is no bright line, in either a technical or a definitional sense, that distinguishes information services, which the BOCs may not provide, from 'exchange' and 'exchange access' services, which they are allowed to provide.... Similarly, there is no clear or competitively rational dividing line between information services and CPE. Most PBXs and other sophisticated CPE perform some information services functions, but the [Consent Decree] permits the BOCs to provide all types of CPE.

J.A. 634–35 (footnotes omitted). We recognize that this passage was part of a lengthy report assessing whether there was a continuing *competitive* justification for the information service restriction. *See* Brief for Appellee United States at 28–29. Yet, the passage plainly states that, in addition to there being no *competitive* reason for distinguishing between an information service and CPE, there was also no *clear* dividing line between the two. Further, the Triennial Review explained that the distinction was increasingly meaningless because the same results could be achieved using equipment and systems permitted by the decree. J.A. 634–35. In effect, DOJ was saying that the divide between the permissible and the impermissible had become so blurred that it was no longer rational to disallow information services.

At oral argument, the Government utterly failed to explain to our satisfaction why the

Telco system was not CPE. The Government continually argued that while the MCI service bureau involved a computer, which alone might qualify as CPE, the "package of services" NYNEX provided qualified as an information system. The Government could not explain, however, what aspects of the "package" were prohibited.

Indeed, when asked about various elements of the service, the Government more often than not conceded their permissibility. For example, the Government agreed that the use of a computer (along with Telco's software) was lawful; that the location of the computer on Telco's premises was not itself unlawful; and also that Telco could lawfully provide maintenance for the system. In addition, countering the Government's argument that the components of the "package" were prohibited, NYNEX directs us to substantial evidence in the record which strongly suggests that most aspects of the MCI service bureau were expressly permitted by either the Consent Decree or specific waivers. *See* NYNEX Corporations' Proposed Findings of Fact and Conclusions of Law, *reprinted in* J.A. 233–39. The District Court made no findings on this showing and the Government did not dispute it.

In particular, NYNEX's list included the following aspects of the MCI service:

(1) The modem's capability to modulate and demodulate telephone signals. According to NYNEX, modulation and demodulation were permitted as exchange services. J.A. 236.

(2) Permitting MCI to reach the Micro-VAX through Telco's Equinox data switch. Switching is expressly included as part of "telecommunications" under the Consent Decree. J.A. 236.

(3) Installing, maintaining and troubleshooting the MicroVAX as needed. J.A. 238.

(4) Licensing software for MCI's use in the MicroVAX and to provide program consulting and help-desk services in connection with the use of that software. J.A. 238.

(5) Providing record conversion and associated services related to MCI's use of the software, including converting elec-

tronic data between tape, disk and paper, making electronic copies of MCI's data (backups), and transforming MCI's magnetic tapes to disk (reformatting where necessary to make the tapes readable by and usable with Telco software). J.A. 238.

(6) Using Telco's printer which was permitted as electronic-to-paper record conversion under the software waiver. J.A. 238.

(7) Sending e-mail to and from the MicroVAX to assist with the CPE and software provided to MCI. NYNEX insists nothing in the software waiver or the Consent Decree was intended to or did prohibit Telco or MCI from the normal use of telephone services to communicate with each other by voice, data, teleconference or facsimile. J.A. 239.

The District Court noted a number of these aspects, never doubting the legality of any individual component. Rather, the District Court apparently concluded that the whole was greater than the sum of the parts, finding that the "package of services" taken together constituted a prohibited information service. We cannot fathom the basis of this calculation, for it seems to ignore the applicable burden of proof in this case. As noted above, the Government was required to produce evidence sufficient to establish guilt *beyond a reasonable doubt.* The Government did not come close to satisfying this burden with respect to the question focused on the *clarity* of the Consent Decree. On this point, it is sufficient to note that, in contrast to the Government's unsupported conclusions, NYNEX points to uncontested evidence in the record tending to show that the MCI service bureau was more squarely in the "gray area" than on the prohibited pole.

The record also indicates that, in other like situations, the Government has taken positions on the scope of the CPE exemption inconsistent with the one that it takes in this case. The District Court incorrectly found that DOJ had never taken the position that a service which is arguably prohibited by the Decree may be provided if it consists of components each of which is permitted by the Decree. *NYNEX,* 814 F.Supp. at 138.

To the contrary, the record contains DOJ letters advising several companies subject to the Decree that they could provide central utility meter reading services. *See* J.A. 603–04, 636–39. Specifically, these services entailed the automatic transmission of meter readings from the utility customers' premises to the operating company, where the information was collected, stored, and then periodically retransmitted to the participating utility over the phone lines. *Id.* Although these "information services" blended customer premises equipment, J.A. 604, 638–39, exchange access, J.A. 639, and management of a telecommunications service—thus requiring a combination of exclusions for their legality—the Government gave its approval.

The Government argues that these letters are not inconsistent with the position taken in this case, because the letters merely indicated that companies could provide *information access* but not *information service*. Brief for Appellee United States at 29 n. 15. This distinction is lost on us. In any event, we surely do not see how it erases the problem before us in the instant case. We can comprehend no meaningful distinction between the service NYNEX provided and the meter reading service which was permitted under the CPE exception.

Adding to the confusion in this case were conflicting views about what it meant to provide CPE. The District Court held that "CPE is the lease or sale by a Regional Company of telephone equipment ... or, perhaps, a computer, to be used on the customer's premises." *NYNEX,* 814 F.Supp. at 136. At oral argument, Government counsel conceded that an arrangement could be characterized as CPE even if a computer remained on a provider's premises.[3] In other words, a customer who was able to work from its home base to control and manipulate data on a remote computer that was dedicated to its use could be viewed as having been provided that equipment as contemplated by the CPE exception found in sections IV(E) and VIII(A) of the Consent Decree. When we consider the matter in light of the express

terms of the Consent Decree, there is no clear answer as to whether the MCI service bureau was permissible CPE or an impermissible information service.

Because nothing in the record supports the Government's contention that the MCI service bureau was not in the "gray area" encompassing the overlap between information services and CPE, we are constrained to find that the Consent Decree lacked the necessary clarity and specificity to support a finding of criminal contempt. Accordingly, we reverse and vacate the judgment of the District Court.

*So ordered.*

---

**3.** Government counsel also claimed that, "depending upon the circumstances," there might have been a violation of section II(D)(1) even if

Telco had moved the computer to MCI's premises. We do not understand what "circumstances" might have prompted such a conclusion.