**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 96-4370

SAMUEL H. MCMAHON, JR.,
Defendant-Appellant.

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Robert D. Potter, Senior District Judge.
(MISC-96-24-3-P)

Argued: September 27, 1996

Decided: January 15, 1997

Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Motz wrote the majority opin-
ion, in which Judge Niemeyer joined. Judge Michael wrote a dissent-
ing opinion.

_____

**COUNSEL**

**ARGUED:** David Carl Cordes, BAILEY, PATTERSON, CAD-
DELL, HART & BAILEY, P.A., Charlotte, North Carolina, for
Appellant. David Alan Brown, Assistant United States Attorney,
Charlotte, North Carolina, for Appellee. **ON BRIEF:** Mark T. Cal-
loway, United States Attorney, Kenneth M. Smith, Assistant United
States Attorney, Charlotte, North Carolina, for Appellee.

_____

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

Samuel H. McMahon, Jr. appeals the district court's finding that he committed criminal contempt by willfully violating a sequestration order. We affirm.

I.

McMahon's contempt conviction arises out of his conduct during the criminal trial of his son, Samuel H. McMahon, III. This trial marked one chapter of years of litigation waged by McMahon and his son against those, including the federal government, charging them and entities controlled by them with fraudulent business activities.[1]

On February 1, 1996, in anticipation of McMahon III's criminal trial, defense counsel moved to sequester the government's witnesses "so that they cannot hear the testimony of other witnesses." The government responded to this motion on the same day, stating that it did not oppose the motion but requested the court to order "the exclusion of all witnesses [except certain government agents] including witnesses for the defendant."

On February 2, the court issued a written order, sequestering all witnesses, save some government agents. The written order provided, inter alia:

> . . . the Government's motion to sequester the Defendant's witnesses will be granted, and the Defendant's witnesses will be excluded from the courtroom.

_____

[1] See, e.g., In re Southeast Hotel Props., No. 95-3188, 1996 WL 628263 (4th Cir. Oct. 31, 1996); In re Southeast Hotel Props., 151 F.R.D. 597 (W.D.N.C. 1993); In re Southeast Hotel Props., 796 F. Supp. 538 (J.P.M.L. 1992); Chrysler Capital Corp. v. Southeast Hotel Props., 697 F. Supp. 794 (S.D.N.Y. 1988), aff'd, 888 F.2d 1376 (2d Cir. 1989); Weisman v. Southeast Hotel Props., No. 91 Civ. 6232, 1992 WL 131080 (S.D.N.Y. June 1, 1992).

Defense counsel was provided a copy of the written order when he, McMahon, and McMahon III arrived for McMahon III's criminal trial on February 5.

Defense counsel did not inform McMahon of the sequestration order and so McMahon remained in the courtroom on February 5 during the voir dire of the jury. At this time, the court reporter offered daily trial transcripts to all interested persons. Although defense counsel did not order daily transcripts of the proceedings, McMahon ordered transcripts for himself.

Later on February 5, after voir dire was completed, but prior to opening statements, the prosecutor asked that McMahon be excluded from the courtroom pursuant to the sequestration order. Defense counsel requested in open court that the court exempt McMahon from the sequestration order because "he is the father of [McMahon III] and I would like for him to be present." The following colloquy then transpired:

> The Court: Does the government object to that?
>
> [Prosecutor]: We do, Your Honor, because Mr. Mc-Mahon's Jr.'s [sic] role in this case will become, I believe, somewhat critical. If [defense counsel] had made the same request with respect to the Defendant's wife, we wouldn't have an objection, but I believe Mr. McMahon Jr. should be excluded.
>
> The Court: I have to go with the request unless there is a good reason for it, I will deny your motion for that. He will have to leave the courtroom.

According to McMahon, defense counsel then "very strongly" reiterated to McMahon that he would have to leave the courtroom, and McMahon left.

The trial proceeded -- it consumed nine days in all. Eventually, government attorneys became aware of the activities of a woman sitting in the back of the courtroom. This woman would take extensive

3

notes of the proceedings and periodically exit the courtroom to make phone calls. Upon learning that the woman in question was McMahon's secretary, Ms. Almond, the court permitted the prosecutor to examine her.

In response to the court's question as to why she was taking notes of the proceedings, Almond testified "Mr. McMahon, Jr. asked me if I would take notes." She produced nearly fifty pages of detailed notes, reflecting the testimony of government witnesses, documents entered into evidence by the government, and questions posed by the Assistant U.S. Attorney. (The district judge later remarked that Almond "took more notes than I did during the trial.") Almond also stated that she received the daily transcripts of the proceedings, brought the transcripts to McMahon's office at his request during the luncheon break, and then copied them for McMahon. Finally, Almond testified that she discussed the trial generally with McMahon in his office.

On the basis of this evidence, the district court initially ruled that McMahon would not be permitted to testify at McMahon III's criminal trial. Later the court concluded that McMahon III should not be deprived of presenting McMahon's testimony because there was insufficient evidence that McMahon III had directed or aided any violation of the sequestration order. For this reason, the court ultimately permitted McMahon to testify at McMahon III's trial; however, the court allowed the government to cross-examine McMahon as to his secretary's activities.

On February 22, 1996, subsequent to the termination of McMahon III's criminal trial, the government moved, pursuant to 18 U.S.C. § 401**2** and Fed. R. Crim. P. 42, for an order to show cause why McMahon should not be held in criminal contempt for willfully violating the

_____

**2** That statute provides in pertinent part:

> A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and no other, as --
>
> . . .
>
> Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

4

sequestration order. The district court granted the motion and, on April 9, held a full evidentiary hearing on the matter.

At that hearing, the court received a number of exhibits and heard testimony from six defense witnesses, including McMahon, and one government witness. McMahon called Almond as his first defense witness. Although she initially attempted to distance herself from her earlier testimony, Almond ultimately acknowledged the truth of that testimony and supplied some additional evidence damaging to McMahon.

She testified that McMahon "requested" that she attend court proceedings. Moreover, she conceded that during the trial's luncheon recess she not only made copies of the daily trial transcripts at McMahon's request, but also left the copies at McMahon's office on her desk. When she returned to the office each day after the trial "sometimes" the trial transcript she had left at lunch would be on her desk and "sometimes it would not be." Moreover, although Almond swore that she never read the trial transcripts herself before the trial concluded, and had never seen McMahon read them, she acknowledged that several pages of the transcript were"dogeared," i.e., intentionally folded over to mark a place. She said that she had not folded the pages and agreed "that people were not in the habit of removing things that belonged to Mr. McMahon Jr. from [her] desk" in his office. Almond also admitted that in addition to generally discussing the trial with McMahon at his office, she telephoned him from the courthouse one or two times each day during the nine-day trial.

After Almond's testimony, McMahon offered several character witnesses and then testified at length on his own behalf. He began his testimony by claiming that one of the reasons he ordered daily trial transcripts was because his son's defense counsel told him that defense counsel would "need" the daily transcript. This testimony contradicted the affidavit McMahon offered from the defense counsel in which counsel swore that he did not want daily transcripts and so advised the court reporter, but that because McMahon himself wanted daily transcripts, counsel ordered them. McMahon admitted that defense counsel gave him pleadings from the proceedings against McMahon III, including the witness lists, and McMahon acknowledged that he knew he was listed as a prospective witness on both

5

witness lists. McMahon asserted, however, that he had never seen the written sequestration order and never been told about it.

McMahon also claimed that he did not know about the oral sequestration order, and that he had been ordered out of the courtroom, not by the district court, but by McMahon III's defense counsel. McMahon had given a somewhat different account when he had testified at McMahon III's criminal trial. Then McMahon had conceded that he had been in the courtroom, had heard the prosecutor ask that he be excluded pursuant to the sequestration order, and had heard defense counsel argue that he be excepted from the sequestration order. McMahon admitted that, before he was excluded from the courtroom, he had known that the district court "had agreed [with the prosecutor] that I had to leave."

As for his secretary's activities, McMahon admitted asking her to pick up the daily transcripts but he said that this was only to have a record of the proceedings. He denied requesting that his secretary attend the trial and claimed that she repeatedly asked him if he would "allow her to come to the trial." He denied asking her to take notes at the trial. He denied reading the notes. Throughout the proceedings, he maintained that he read no more than the cover pages of the trial transcripts. Yet, he could not explain how his copies of the transcripts came to be "dogeared." Further, he did not "know" and was "not sure" how he learned of, and referred to, a government witness' trial testimony during his own trial testimony.

The government offered the testimony of one witness, Patty O'Brien. That witness corroborated the trial testimony of another witness, Renee Serwin, that McMahon had asked Serwin "to go to the bankruptcy court and lie about" McMahon III's request that they both create false documentation on certain business records.

At the conclusion of the hearing the district court found that the evidence demonstrated beyond a reasonable doubt that McMahon willfully violated the court's sequestration order. Accordingly, the court found him in criminal contempt and sentenced him to thirty days imprisonment, but stayed that sentence pending appeal. Seven days later, the court issued a fifteen page written order, replete with

6

numerous factual findings more fully explaining its finding of guilt. This appeal followed.

## II.

The sole issue before us is whether the district court erred in finding McMahon in criminal contempt for violating the sequestration order.

The court issued the sequestration order pursuant to Fed. R. Evid. 615, which provides in pertinent part:

> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion.

It has long been established that a judge may find a person who violates a sequestration order in contempt of court. See, e.g., Holder v. United States, 150 U.S. 91 (1893).

McMahon does not claim to the contrary. Nonetheless, he poses a two-pronged argument as to why the district court erred in finding him in contempt. First and principally, he asserts that because the district court failed to "instruct counsel and witnesses" specifically on the sequestration order and "its intended scope," he should not be held in contempt for violation of the order. Second, he maintains that the evidence fails to establish beyond a reasonable doubt that he "willfully took possession of, and read, notes or transcripts of trial testimony."

"To support a conviction of criminal contempt for violation of a court order, it must be proved beyond a reasonable doubt, that a person willfully, contumaciously, intentionally, with a wrongful state of mind, violated a decree which was definite, clear, specific, and left no doubt or uncertainty in the minds of those to whom it was addressed." Richmond Black Police Officers Ass'n v. City of Richmond, Virginia, 548 F.2d 123, 129 (4th Cir. 1977) (internal citations omitted). A court's legal conclusion of guilt must be supported by evidence sufficient to prove guilt beyond a reasonable doubt. See, e.g., United

7

States v. Ismail, 97 F.3d 50, 55 (4th Cir. 1996); United States v. Bales, 813 F.2d 1289, 1293 (4th Cir. 1987). However, a trial court's underlying factual findings must be accepted unless they are clearly erroneous. Bales, 813 F.2d at 1293.

With these principles in mind, we consider each of McMahon's arguments.

A.

McMahon's chief claim is that the sequestration order was not sufficiently specific to provide the basis for a finding of criminal contempt. In order for a violation of a court order to constitute criminal contempt, constitutional principles of fair notice require that the order be "definite, clear, and specific" enough so that it leaves "no doubt or uncertainty in the minds of those to whom it was addressed." Richmond, 548 F.2d at 129.

However, in assessing if an order contains the requisite specificity, we look at the defendant's "own behavior and not to some hypothetical situation." United States v. Trudell, 563 F.2d 889, 892 (8th Cir. 1977). Thus, contrary to McMahon's suggestion, whether a hypothetical witness would be on notice that he "could not read, contact, discuss, or review anything pertaining to the trial outside the courtroom" is immaterial.[3] The question we must resolve is whether the district

_____

[3] Furthermore, none of the authority that McMahon cites supports the view that absent specific instruction that a witness should not "read, contact, discuss, or review anything pertaining to the trial outside the courtroom, no witness should be held in contempt for engaging in such conduct." The cases upon which McMahon relies do not even involve a finding of criminal contempt. Rather, they concern the very different question of whether a trial court abused its discretion in permitting a witness who arguably violated a sequestration order to testify. See United States v. Sepulveda, 15 F.3d 1161, (1st Cir. 1993), cert. denied, 114 S. Ct. 2714 (1994); United States v. Buchanan, 787 F.2d 477 (10th Cir. 1986), rev'd on other grounds after remand, 891 F.2d 1436 (10th Cir. 1989), cert. denied, 494 U.S. 1088 (1990); United States v. Johnston, 578 F.2d 1352 (10th Cir. 1978), cert. denied, 439 U.S. 931 (1978). In two of these cases, after noting that any violation of the sequestration order did

8

court clearly erred in concluding that McMahon, a sophisticated businessman, who, for a number of years, had been engaged in a series of hotly contested cases defending himself and his son from charges of fraudulent activity in million-dollar business deals, knew that his conduct violated the sequestration order.

Moreover, in a criminal contempt case involving a sequestration order:

> The court should consider the entire background behind the order -- including the conduct the order was meant to enjoin or secure, the interests that it was trying to protect, the manner in which it was trying to protect them, and any past violations and warnings -- in determining whether the order is sufficiently specific.

United States v. Greyhound Corporation, 508 F.2d 529, 532 (7th Cir. 1974); accord United States v. Hodge, 894 F. Supp. 648, 651 (S.D.N.Y. 1995). Unlike the typical complex order that a defendant attacks as insufficiently specific, the conduct enjoined here is stunningly simple: prospective witnesses were barred from the courtroom.[4]

_____

not appear to prejudice the case, the appellate court held the trial judge did not abuse his discretion in permitting the testimony. Sepulveda, 15 F.3d at 1176-77; Johnston, 578 F.2d at 1354. Although the Tenth Circuit in Buchanan determined that the lower court had erred in not properly instructing the witness about the sequestration order, it nevertheless found that the appellant had failed to prove probable prejudice sufficient to justify excluding the testimony. Buchanan, 787 F.2d at 484-85.

[4] Compare, for example, the order here with the order in the case on which our dissenting colleague principally relies, United States v. NYNEX Corp., 8 F.3d 52 (D.C. Cir. 1993). There, § II (D) of the order prohibited regional telephone companies from providing "informational services," which were defined in § IV (J) of the order to mean "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information which may be conveyed via telecommunications." Id. at 53. However, § VIII of the order provided that "[n]otwithstanding the provisions of section II-1.c.(D)(2), [Regional Companies] shall be permitted to provide, but not man-

9

The interest protected was clear: "to prevent the possibility of one witness shaping his testimony to match that given by other witnesses at the trial." United States v. Leggett, 326 F.2d 613 (4th Cir.), cert. denied, 377 U.S. 955 (1964). Accord, Opus 3 Ltd. v. Heritage Park, Inc., 91 F.3d 625, 628 (4th Cir. 1996) (the sequestration rule is "designed to discourage and expose fabrication, inaccuracy, and collusion"). See also Fed. R. Evid. 615, advisory committee note ("The efficacy of excluding or sequestering witnesses has long been recognized as a means of discouraging and exposing fabrication, inaccuracy, and collusion."); United States v. Farnham, 791 F.2d 331, 334-35 (4th Cir. 1986).

Nonetheless, McMahon testified and continues to maintain on appeal that he never knew of the written sequestration order, never understood that the court orally barred him from the courtroom, and never realized that his activity, including talking with his secretary about the trial she attended and took notes of, would violate the court's written and oral sequestration orders. The district court concluded that McMahon was "unworthy of credence," that, in fact, he knew about the sequestration order and attempted to circumvent it so that he "could address the harmful testimony of other witnesses" in order to "undermine the government's case and further his son's cause."

The court based this conclusion on numerous factual findings. The court found "untenable" McMahon's claim that he had no knowledge of the sequestration order because:

_____

ufacture, customer premises equipment." Id. "All parties agree[d]" that "`informational services,'" which NYNEX could not provide and customer premises equipment, "CPE," which it could provide, "substantially overlapped." Id. at 55. Moreover, the Government was unable to "rationally differentiate" between "an information service and a CPE." Id. Furthermore, the Government had advised other companies subject to the same order that the CPE exemption permitted conduct very similar to NYNEX's alleged contemptuous conduct. Id. at 57. Only in light of this and other evidence of ambiguity in the complicated order did the NYNEX court conclude that the order "lacked the necessary clarity and specificity to support a finding of criminal contempt" by NYNEX. Id. There is, of course, no comparable evidence of ambiguity in the short, easily understood order at issue here.

10

[McMahon] admits that [defense counsel] gave him the witness lists and that he knew he was on both witness lists. He was present in the courtroom during voir dire when both parties described him as a potential witness. He was present in the courtroom when the Government argued that he had to be excluded from the courtroom because his testimony was critical to the case. During that discussion, the Government expressly distinguished between McMahon, Jr.-- who had to be excluded because he was a witness -- and his wife who did not have to be excluded -- because she was not a witness. Likewise, McMahon, Jr.'s other son, Byron McMahon, was also excluded from the courtroom because he was a witness. Thus, the only family members who were excluded from the courtroom, were those who were potential witnesses. Under these circumstances, the Defendant could not help but know that he was excluded from the Court because he was a witness -- the character[sic] that separated him and Byron from other family members. In this regard it should be noted that the Defendant is no dummy; he is a highly successful real estate developer. He and his son, Samuel H. McMahon III, managed limited partnerships worth tens of millions of dollars. . . . Samuel H. McMahon, Jr.'s claim of ignorance is also incredible for another reason: implicitly, he asks this Court to believe that he was excluded from the felony trial of his son, a trial attended by the whole McMahon family and a trial he tried to attend himself before he was excluded, but he never knew why he was excluded and never asked for an explanation. Like other parts of Samuel H. McMahon, Jr.'s story, this part just does not make sense.

As to McMahon's contention that he did not know that reading trial transcripts or discussing the trial with his secretary violated the sequestration order, the court also rejected that assertion as "untenable."

The sequestration order is a product of common sense and its purpose is obvious; it is not a subtle legal doctrine as to which the Defendant's plea of ignorance might have some force. In this Court's view, an instruction that he could not circumvent the sequestration order by reviewing trial tran-

11

scripts or receiving reports from his secretary would simply have stated the obvious. Moreover, his contention that he did not ask his secretary to take notes, did not discuss the trial with her, and did not read the trial transcript belies his contention that he did not know about the sequestration order and did not understand its scope. If McMahon, Jr. did not know about the sequestration order and did not know that he could not monitor the courtroom proceedings by reading the transcript, then why didn't he talk with his secretary and why did he read just the cover-page of the daily transcripts that he ordered and that were placed in his office on a daily basis? The answer is obvious: The Defendant knew about the sequestration order and understood its scope.

We cannot conclude that the district court clearly erred in making these findings. Although ignorance of the terms of a sequestration order would ordinarily preclude a finding of contempt, a person "is not permitted to maintain a studied ignorance of the terms of a decree in order to postpone compliance and preclude a finding of contempt." Perfect Fit Indus. v. Acme Quilting Co., 646 F.2d 800, 808 (2d Cir. 1981), aff'd after remand, 673 F.2d 53 (2nd Cir.), cert. denied, 459 U.S. 832 (1982). If McMahon truly remained ignorant of the sequestration order, it was indeed a "studied ignorance." By his own admission, he was in court and heard the prosecution move that he be excluded from his son's criminal trial and defense counsel argue that he be excepted from the sequestration order. He concededly understood that the court agreed with the prosecutor that he had to be excluded. In light of this, "[n]o concept of basic fairness is violated by requiring [McMahon] to be more than normally careful in his future conduct." United States v. Custer Channel Wing Corp., 247 F. Supp. 481, 496 (D. Md. 1965) (Winter, J.), aff'd , 376 F.2d 675 (4th Cir. 1967), cert. denied, 389 U.S. 998 (1967).

B.

McMahon's secondary argument, that the government offered insufficient evidence to prove his guilt of criminal contempt beyond a reasonable doubt, must also fail. Again, the district court's detailed

12

factual findings render McMahon's argument untenable. The court found:

> The evidence that tends to prove Samuel H. McMahon, Jr.'s violation of the sequestration order also establishes his knowledge and intent. That evidence establishes that Samuel H. McMahon, Jr.'s secretary was paid to attend the trial of Samuel H. McMahon, Jr.'s son and asked to take notes of the trial proceedings. At Samuel H. McMahon, Jr.'s direction, daily transcripts were ordered and they were taken back to Samuel H. McMahon, Jr.'s office where they were copied by his secretary. The daily transcript was copied on a daily basis and those transcripts were placed on her desk in his office -- an office that people don't enter ordinarily. Sometimes the transcripts had been moved during her absence. The copy of the transcript left in Samuel H. McMahon Jr.'s office was deliberately dog-eared (which is not the hallmark of surreptitious reading), and the Defendant has admitted that he read the cover-page of the transcript, but he swears he read no more -- although he did not know that further reading would be wrong. This evidence of motive, plan, and opportunity virtually compels the conclusion that Samuel H. McMahon, Jr. violated the order. When the Court considers Samuel H. McMahon, Jr.'s lack of creditability no other conclusion is possible.

We recognize that "[w]ilfullness, for the purpose of criminal contempt, does not exist where there is a [g]ood faith pursuit of a plausible though mistaken alternative.'" Greyhound, 508 F.2d at 532 (quoting In re Brown, 454, F.2d 999, 1007 (D.C. Cir. 1971)). Here, however, nothing in McMahon's conduct demonstrates good faith. Rather, the record reeks of a father's headstrong determination to aid his son regardless of the consequences. As the district noted, "[t]his impulse, while understandable, is nonetheless illicit."

A trial court must be permitted to retain the ability to control the witnesses and litigants before it. Without that control, our system of justice would suffer. Finding McMahon in criminal contempt on the evidence in this case "falls within the ambit of permissible maintenance of judicial decorum and represents a reasonable implementation

13

of the due-process mandate to preserve at all costs an atmosphere essential to the most fundamental of all freedoms-- a fair trial." Seymore v. United States, 373 F.2d 629, 632 (5th Cir. 1967) (internal quotation marks omitted).

III.

The judgment of the district court is

AFFIRMED.

MICHAEL, Circuit Judge, dissenting:

I respectfully dissent. The order as written and explained did not clearly prohibit McMahon's conduct. The order's failure to specify anything other than exclusion from the courtroom cannot be salvaged by evidence suggesting that McMahon believed the order to be broader in scope. This is a criminal contempt case, and the existence of a clear and specific order was not proved beyond a reasonable doubt. I would therefore reverse McMahon's conviction.

I.

The written sequestration order, entered pretrial, provided that "the Defendant's witnesses will be excluded from the courtroom." Just before opening statements were to begin, the prosecutor noticed that McMahon, who was listed as a defense witness, was in the courtroom. The prosecutor, after telling the court he believed McMahon's "role in this case will become . . . somewhat critical," asked that McMahon be excluded. The court agreed and its oral order was simply, "He will have to leave the courtroom." McMahon obeyed and later testified for the defense. McMahon was convicted of criminal contempt for violating the sequestration order because he got reports of the trial proceedings from his secretary and read the daily transcript.

As the majority recognizes, to convict McMahon for criminal contempt the government had to prove three elements beyond a reasonable doubt: (1) a willful (2) violation (3) of "a decree which was definite, clear, specific, and left no doubt or uncertainty in the minds

14

of those to whom it was addressed." <u>Richmond Black Police Officers Ass'n v. City of Richmond</u>, 548 F.2d 123, 129 (4th Cir. 1977). The problem here is that the majority believes (as did the district court) that because there was evidence to show that McMahon believed he was guilty, he necessarily violated an order that was definite, clear and specific. Thus, the majority conflates the specificity and willfulness elements with the result that specificity drops out of the picture. The majority confirms its error when it says that to determine whether the order has the requisite specificity, "[t]he question we must resolve is whether the district court clearly erred in concluding that McMahon . . . knew that his conduct violated the sequestration order." <u>Ante</u> at 8-9.

Because of the potency of the contempt power, I believe it is dangerous to ease the government's burden of proof in such a significant way. Moreover, there is really no precedent for it. Our <u>Richmond Black Police Officers</u> case plainly requires both that the defendant act willfully and that the order be sufficiently specific. Other cases cited by the majority also separate these two requirements. <u>See Perfect Fit Industries, Inc. v. Acme Quilting Co., Inc.</u>, 646 F.2d 800, 808 (2d Cir. 1981) ("[A] person cannot be held in contempt of an order if he does not have knowledge of the order or if the terms of the order are unclear or ambiguous . . . .") (citations omitted), <u>aff 'd after remand</u>, 673 F.2d 53 (2d Cir.), <u>cert. denied</u>, 459 U.S. 832 (1982); <u>United States v. Greyhound Corp.</u>, 508 F.2d 529, 532 (7th Cir. 1974) (stating that the court must determine "whether the order is sufficiently specific and . . . whether the defendant knew or should have known that his conduct was wrongful"); <u>United States v. Hodge</u>, 894 F. Supp. 648, 651 (S.D.N.Y. 1995) ("To hold a person in criminal contempt, the government must prove beyond a reasonable doubt that: (1) the court entered a reasonably specific order; (2) defendant knew of that order; (3) defendant violated that order; and (4) his violation was willful.").

The district court here glossed over the specificity problem with findings such as "[t]he sequestration order is a product of common sense," "an instruction that [McMahon] could not circumvent the sequestration order by reviewing trial transcripts or receiving reports from his secretary would simply have stated the obvious," McMahon "is no dummy," and his explanations were "unworthy of credence."

15

In other words, McMahon believed he was doing wrong, so the order was therefore specific enough. But proving that McMahon believed his conduct was wrongful should go to the willfulness element; it should not be sufficient to prove specificity. By affirming the district court's approach, the majority improperly endorses the conflation of the willfulness and specificity elements, with willfulness counting for both.

In using the evidence that McMahon acted willfully to confirm that the order was clear, the majority makes the same error as the district court in United States v. NYNEX Corp., 814 F. Supp. 133 (D.D.C. 1993). In that criminal contempt case the district court found NYNEX to be in violation of an earlier consent decree that prohibited regional telephone companies such as NYNEX from providing"information services." The district court concluded that because several NYNEX employees had feared that the company was in violation of the decree, the decree was undoubtedly clear. See id. at 139-40. The D.C. Circuit reversed, holding that the employees' belief of violation was "insufficient evidence to support the District Court's conclusion that the clarity element was proven beyond a reasonable doubt." United States v. NYNEX Corp., 8 F.3d 52, 55 (D.C. Cir. 1993). The court analyzed the district court's error as follows:

> From our vantage point, the heart of the problem in this case is that the District Court apparently assumed that, because several NYNEX officials feared that the MCI service bureau might be a prohibited information service, the Consent Decree was undoubtedly clear with respect to the question at issue. . . . In other words, the District Court seemed to think that if NYNEX officials acted willfully they necessarily violated a clear order of the court. This reasoning improperly conflates the elements of criminal contempt, and it unacceptably alters the Government's burden of proof.

Id. at 54.*

_____
*The D.C. Circuit's United States v. NYNEX is right on point, unlike United States v. Trudell, 563 F.2d 889, 892 (8th Cir. 1977), and United States v. Greyhound Corp., 508 F.2d 529, 532 (7th Cir. 1974), two cases

16

At bottom, the majority's approach avoids any criticial examination of the actual language of the sequestration order. I turn to that in the next part.

II.

The district court issued its sequestration order under Fed. R. Evid. 615, which states: "At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion." The text of the rule only prohibits prospective witnesses from entering the courtroom to hear testimony of other witnesses. See 2 Stephen A. Saltzburg, Michael M. Martin, and Daniel J. Capra, Federal Rules of Evidence Manual 1029 (6th ed. 1994) ("In our view, Rule 615 by its terms applies only to the exclusion of witnesses from the courtroom."). Despite the narrowness of the text, trial courts are free to broaden the scope of their orders beyond courtroom exclusion. See United States v. Sepulveda, 15 F.3d 1161, 1176 (1st Cir. 1993) ("In sum, [Rule 615] demarcates a compact procedural heartland, but leaves appreciable room for judicial innovation beyond the perimeters of that which the

_____

relied on by the majority for its specificity analysis. Trudell said: "In order to successfully challenge a statute [or order] on vagueness grounds, a litigant must make a showing that the challenged statute [or order] lacks specificity as to his own behavior and not as to some hypothetical situation." 563 F.2d at 892. This does not mean that behavior determines specificity, as the majority suggests. See ante at 8. Instead, Trudell is only making clear that an order's vagueness as applied to hypothetical situations is irrelevant if the order clearly prohibits the defendant's behavior. McMahon never claims that the order fails the specificity requirement because it is vague in its hypothetical application to others even though it might cover his own conduct. Greyhound Corp., which involved a ten-paragraph order requiring Greyhound to cooperate with another bus company, did indicate that the same list of factors should be considered in determining specificity and willfulness. But Greyhound Corp. did not focus on specificity. The question there was whether the proof was sufficient to establish willfulness, that is, "determining whether the defendant knew or should have known that his conduct was wrongful." 508 F.2d at 529. In any event, I believe that United States v. NYNEX is a better-reasoned decision.

17

rule explicitly requires."), <u>cert. denied</u> 114 S.Ct. 2714 (1994); Michael Graham, Federal Practice and Procedure, Federal Rules of Evidence § 6611, at 216-28 (interim ed. 1992) ("While Rule 615 provides solely for the exclusion of witnesses from the courtroom, the court may take further measures of separation designed to prevent communication between witnesses, such as ordering them to remain physically apart, ordering them not to discuss the case with one another or with any attorney, and ordering them not to read a transcript of the trial testimony of other witnesses."); 1 John William Strong, McCormick on Evidence § 50, at 191 (4th ed. 1992) (same).

I recognize that on the "question of whether a trial court abused its discretion in permitting [or failing to permit] a witness who arguably violated a sequestration order to testify," <u>ante</u> at 8 n.3, some cases have held that a Rule 615 sequestration order does cover more than courtroom exclusion, even if the order only mentions exclusion. <u>See e.g.</u>, <u>United States v. Greschner</u>, 802 F.2d 373, 375 (10th Cir. 1986) (holding that Rule 615 prohibits discussion of the case between witnesses), <u>cert. denied</u>, 480 U.S. 908 (1987); <u>Miller v. Universal City Studios, Inc.</u>, 650 F.2d 1365, 1373 (5th Cir. 1981) (holding that Rule 615 prohibits the reading of trial transcripts). However, as the majority recognizes, such cases "concern [a] very different question" from that of finding criminal contempt. In this "very different" context, courts have still struggled over the extent to which conduct other than courtroom attendance is barred by a simple sequestration order barring witnesses from the courtroom. <u>See Sepulveda</u>, 15 F.3d at 1176 (holding that Rule 615 only requires that witnesses be excluded from the courtroom proper); <u>United States v. Scharstein</u>, 531 F. Supp. 460, 463 (E.D. Ky. 1982) (holding that a Rule 615 order need not prohibit witnesses from discussing the case with one another). Moreover, even the Tenth Circuit, which construes the invocation of Rule 615 to prohibit discussion between witnesses, also requires that the trial court specify this prohibition in its order. <u>See United States v. Buchanan</u>, 787 F.2d 477, 484-85 (10th Cir. 1986) (holding that the trial court erred in failing to state "clearly" in its sequestration order that witnesses are not to discuss the case), <u>rev'd on other grounds after remand</u>, 891 F.2d 1436 (10th Cir. 1989), <u>cert. denied</u>, 494 U.S. 1088 (1990); <u>United States v. Johnston</u>, 578 F.2d 1352, 1355 (10th Cir. 1978) (admonishing trial courts to instruct sequestered witnesses that

18

they are not to discuss their testimony with other witnesses), <u>cert. denied</u>, 439 U.S. 931 (1978).

This confusion about how far the scope of a bald Rule 615 order extends for the sanction of excluding testimony underscores the necessity of a specific order when criminal contempt is charged. In this case, the district court's written order stayed within the narrow text of Rule 615. The order states only that "the Government's motion to sequester the Defendant's witnesses will be granted, and the Defendant's witnesses will be excluded from the courtroom." In enforcing the order against McMahon in open court at the beginning of trial, the court said simply, "He will have to leave the courtroom." There is no mention of any prohibited activity other than entering the courtroom. In fact, even the majority recognizes that the order was "stunningly simple: prospective witnesses were barred from the courtroom." <u>Ante</u> at 9.

There is not sufficient evidence to establish that the order was clear enough to prohibit the reading of daily transcript or receiving reports from an observer. The text of the written order does not support an expansion to prohibit these activities. The court's oral command to McMahon, "He will have to leave the courtroom," actually emphasizes that only courtroom exclusion was required. The court did nothing to communicate the existence of a broader scope to the order. To find specificity the court could only go to McMahon's state of mind -- McMahon had to know what the order meant because "he [was] no dummy" and the scope of the order was "obvious." However, as I point out in part I, McMahon's belief of guilt is not sufficient to prove the order's clarity (the specificity element) beyond a reasonable doubt.

In addition, the majority's acceptance of the district court's finding that the scope of the order was "obvious" raises questions about what other activities might be "obvious" violations. What if Mrs. McMahon, without any prompting from McMahon, had reported on the trial proceedings each evening at supper? What if McMahon had read newspaper accounts of the trial? What if he had seen or heard reports about it on television or radio? What if he had overheard someone giving a firsthand account in a restaurant? The point is that there is no predictable line between "obvious" and "not obvious." For

19

criminal contempt purposes, I would draw the line at the actual text of the order, which was exclusion from the courtroom.

The majority has opened a dangerous path in criminal contempt cases. If the government can offer evidence that allows an inference that the defendant believes himself to be guilty, the specificity element is no check against use of the contempt power. As the Supreme Court recognized in International Longshoreman's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 76 (1967): "The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one."