**In re AIR CRASH AT CHARLOTTE, NORTH CAROLINA ON JULY 2, 1994.**

**No. MDL 1041.**

United States District Court, D. South Carolina, Columbia Division.

Aug. 11, 1997.

James Wilton Orr, Bowers, Orr & Dougall, Columbia, SC, Lawrence Edward Richter, Jr., The Richter Firm, P.A., Mt. Pleasant, SC, William Parham Simpson, Haynsworth, Marion, McKay & Guerard, Columbia, SC, Michael L. Baum, Kananack, Murgatroyd, Baum & Hedlund, Los Angeles, CA, Frank H. Granito, Speiser, Krause, Madole & Nolan, New York City, Marc Moller, Lori B. Lasson, Kreindler & Kreindler, New York City, David E. Rapoport, Rapoport & Kupets Law Offices, Rosemont, IL, for Plaintiff's Steering Committee.

Mark A. Dombroff, Tom Almy, Dombroff and Gilmore, Washington, DC, Edward Wade Mullins, Jr., Nelson, Mullins, Riley & Scarborough, Columbia, SC, Richard B. Watson, Nelson, Mullins, Riley & Scarborough, Charleston, NC, for USAir.

Patrick E. Bradley, U.S. Dept. of Justice, Torts Branch, Civil Division, Washington, DC, Raymond E. Clark, Asst. U.S. Attorney, Columbia, SC, for U.S.

## FINDINGS AND CONCLUSIONS RELATING TO IMPOSITION OF SANCTIONS

JOSEPH F. ANDERSON, Jr., District Judge.

This order relates to the imposition of sanctions on counsel during the consolidated liability trial in this matter. The sanctions were initially imposed on the twentieth day of trial for two separate but related actions of counsel. First, counsel had been providing daily transcripts of trial testimony to a fact witness despite an order granting a joint motion to sequester fact witnesses. Second, counsel seriously misused the subpoena power of this court.

The sanctions were the subject of a motion to rescind filed after the trial concluded. That motion has now been withdrawn.[1] This order memorializes the reasons underlying the imposition of sanctions and modifies the prior oral ruling to clarify that the sanctions are imposed under both the inherent authority and criminal contempt powers of the court.

## BACKGROUND

### 1. Nature of the case and experience level of counsel

The conduct at issue occurred during the consolidated liability trial relating to the crash of USAir Flight 1016. That crash occurred near Charlotte, North Carolina on July 2, 1994, and resulted in the death or injury of all on board. Forty-six actions were either filed in this district or transferred here pursuant to 18 U.S.C. § 1404(a). With the consent of the parties, all but one of these actions were consolidated for a joint trial on the question of liability.[2]

Due to a pretrial admission of liability by the United States of America ("government")[3] and a settlement agreement between the government and USAir, it was already determined at the outset of the trial that the plaintiffs would receive actual damages and that USAir would pay a set percentage of the actual damages regardless of the outcome of the liability trial. This is hardly to say that USAir had nothing at stake in the litigation. Two very significant issues remained. First, if USAir were found liable, there was potential for an award of punitive damages that would be paid entirely by USAir. Second, if USAir were found liable, actual damages would be decided by a jury.[4] Given these high stakes, it is no surprise that both sides were represented at trial by well trained, thoroughly experienced trial counsel.

Mark Dombroff, Esquire, whose conduct is at issue, is a named partner in the Washington, DC law firm of Dombroff & Gilmore. He served as lead counsel for USAir. Mr. Dombroff is an experienced trial lawyer who has apparently served as lead counsel in a number of major trials, many involving air disasters. He is also the author of a number of books on litigation tactics and techniques. Although Mr. Dombroff conducted the vast majority of the examination and cross-examination of witnesses on behalf of USAir, he was, at all times, assisted at counsel table by at least two other experienced attorneys.

Throughout the trial, Mr. Dombroff proved himself knowledgeable of the written rules of procedure and evidence and the intricacies of past decisions interpreting the rules. He

---

1. The motion to rescind challenged the sanctions primarily on the merits but also suggested some procedural concerns. By order dated July 17, 1997, this court sought further input on the procedural issues and suggested further process would be provided if sought. The motion was withdrawn on the date a response would otherwise have been due. Thus, this court presumes counsel is satisfied that due process was provided.

2. By the time the trial began, twenty-six actions remained for trial, the rest having settled.

3. The government was a defendant or third-party defendant in all of the consolidated actions.

4. If USAir were not found liable, the actual damages to be awarded against the government would be determined in a bench trial. As noted in the text, USAir's percentage share of actual damages would be the same regardless of whether USAir was found liable.

also proved himself adept at arguing for novel applications of the rules when such application would provide an advantage to his client.

The court's purpose in providing this background is not to find fault with Mr. Dombroff but simply to point out that he was neither ignorant nor unwary of the rules. Neither was he unable, either personally or through others, to research any matter on which he might harbor a doubt. Indeed, he proved at all times both willing and able to press the outer limits of allowable construction of rules and precedent. In regard to the two matters here at issue, this court finds that Mr. Dombroff overstepped the obvious outer limits to obtain an unfair advantage.[5]

## 2. The sanctioned conduct

### A. Provision of trial transcripts

Both of the actions for which sanctions were imposed involved the same witness, Captain Edward M. Davidson. Captain Davidson is a pilot with Northwest Airlines,

the same airline which employed plaintiffs' key expert witness, Captain Patrick Clyne.

Captain Davidson was called as an impeachment witness on a single issue of fact: Northwest Airlines' procedures for thunderstorm avoidance. Because Captain Davidson was called solely for impeachment purposes, his identity was not disclosed to plaintiffs before trial. However, because of a court imposed requirement to disclose all witnesses to be called in the next two trial days, Captain Davidson was revealed as a witness shortly before he was called.[6]

At the time Davidson was identified, plaintiffs' counsel raised a concern regarding possible intimidation of Captain Patrick Clyne. The alleged intimidation was evidenced largely by a series of very offensive and, arguably, threatening electronic bulletin board communications between pilots. Several of the messages specifically referenced Davidson's anticipated testimony, and one or more referred to receipt of transcripts of Clyne's testimony. These latter references raised the question of whether Davidson had

---

**5.** In a memorandum filed on May 23, 1997, the Plaintiffs' Steering Committee ("PSC") pointed to a number of other instances in which Mr. Dombroff arguably overstepped the limits in seeking tactical advantage. These other instances are not before the court and the court will not consider them in resolving this motion beyond their demonstration of the point raised in the text: that is that Mr. Dombroff was quite willing and able to argue for interpretation or extension of the rules when he felt it advantageous to his client.

The court is, however, constrained to comment on one particular matter raised by the PSC, even though that matter was not considered in reaching the present decision. That is the issue of nondisclosure of a letter sent to USAir from Boeing, a third-party vendor. The Boeing letter, which was not prepared by USAir employees or special consultants, predated the disaster at issue in this trial. It included comments that were critical of a number of USAir procedures including one of particular significance to this litigation. USAir sought to protect this letter, along with approximately fifty other documents, from disclosure by claiming a self-critical evaluation privilege. This court found that even if recognized by state law, the privilege was not applicable to the group of documents sought to be protected. USAir appealed this court's order requiring disclosure of this group of documents

all the way to the United States Supreme Court. This action by USAir ultimately resulted in a very significant delay in plaintiffs' receipt of this potentially damaging document. While this court does not find the request for protection as to the other documents to be unreasonable, even if the privilege was not sustained, this court has seen nothing that would suggest any reasonable basis for withholding the Boeing letter. It was, in effect, buried among dozens of other documents for which the critical self-evaluation privilege was at least debatable.

**6.** Due to the anticipated length of trial, the court suggested this procedure, to include impeachment witnesses, at the outset of trial. Counsel for both sides agreed. During the plaintiffs' case, defendant sought and was granted a request to extend the requirement to disclosing the order in which witnesses were called. Defendant further sought and was granted a request to apply the requirement to the introduction of deposition testimony. This is not to say that plaintiff received equal benefit of the rule.

On several occasions the defense was late in naming witnesses or appears to have intentionally provided far more names than it actually intended to call. Such tactics, while not addressed directly by this order, again demonstrate the manner in which this case was tried and the ability of defense counsel to take maximum (and potentially unfair) advantage of all rulings.

received and passed on daily transcripts from the trial.[7]

Mr. Dombroff conceded that Davidson had been provided copies of the trial transcripts up until the eighth day of trial when the court, at sidebar, reminded counsel that they should not be providing copies of transcripts to fact witnesses because of the sequestration order. Mr. Dombroff states that he immediately stopped providing transcripts to Mr. Davidson following this discussion.

When Captain Davidson was disclosed as an upcoming witness, and in light of the references to him in the electronic bulletin board messages, plaintiffs sought the opportunity to depose Captain Davidson. The court granted this request with the deposition to be conducted the evening before he was to testify. That deposition confirmed that Captain Davidson had received the transcripts of Captain Clyne's trial testimony from Mr. Dombroff.

### B. Improper use of a subpoena

During his deposition, Captain Davidson further revealed that he was present for trial based on receipt of an invalid subpoena, which he had been led to believe was valid. The facts surrounding the issuance of the subpoena are not disputed.

Prior to appearing at trial, Captain Davidson advised his employer that he had been asked to testify. Captain Davidson's supervisor advised him that Northwest Airlines preferred that Davidson not testify unless he was required to by subpoena. Captain Davidson informed defense counsel of this discussion. At that point, Mr. Dombroff sent a signed subpoena form by facsimile to Captain Davidson who was in Atlanta, Georgia. The subpoena directed Davidson to attend the trial in Columbia, South Carolina. There is no suggestion that either a witness fee or mileage check was provided. As intended by Mr. Dombroff, Captain Davidson showed the subpoena to his supervisor and received permission to attend trial on this basis.

When questioned by the court as to whether he was present voluntarily, Captain David-

son indicated a belief that he was required to be present by the subpoena. Counsel for USAir does not suggest that either Captain Davidson or his employer were ever informed that the subpoena was, in fact, invalid for a number of reasons discussed below.

### C. Counsel's response at trial and the court's imposition of sanctions

The above issues were fully developed in an adversarial hearing between plaintiffs and defendant in the context of plaintiffs' motion to exclude Captain Davidson as a witness. During that discussion, Mr. Dombroff argued that whatever the court decided as to the propriety of the actions, his client should not be punished by exclusion of the witness as the error was his, not his client's. Finding no harm to plaintiffs that could not be overcome by allowing broad cross examination, the court allowed Captain Davidson to testify despite the serious nature of the conduct relating to this witness.

After the conclusion of Davidson's testimony, the court addressed Mr. Dombroff as follows:

> All right, I want to go back into what we took up about this transcript before the break. Mr. Dombroff, you suggest—in arguing that the witness should be allowed to testify, and not withstanding the fact that he had seen these transcripts when we had sequestered witnesses, you basically said, "don't hold it against my client." But you didn't tell me who I should hold it against. And you also told me that you had not requested sequestration.

> \*     \*     \*     \*     \*     \*

> Well, I will just be honest with you, I'm considering some type of monetary sanction on counsel in the range of $500 to $1,000. We will take it up after the break.

> I will be glad to hear from you in mitigation. . . . I took your recommendation I did not hold it against your client. . . . So we

---

7. Ultimately, Captain Davidson testified that he had passed on some pages of transcripts of the trial. He admitted that he had received several days of Captain Clyne's trial testimony. Captain Davidson was not personally aware of the sequestration order.

will take that up and hear from you when we get back from break.

Tr. 20–190 to 20–191.

After a recess in the proceedings, the court addressed the matter, both in terms of the sharing of the transcript and the invalid subpoena. Tr. 20–191 to 20–192. The court concluded: "So I will be glad to hear from you, Mr. Dombroff." The following very brief exchange followed:

> MR. DOMBROFF: Thank you, your honor. The only point I would make is the fact that to the extent I indicated earlier with respect to the sequestration, I did not recall that we had that in our pretrial brief, and if it was there it was because I didn't recall it. Other than that, your honor, whatever you deem is appropriate, I certainly will abide by it.

> THE COURT: All right. Well, the sanction for civil contempt is a $1,000 fine, payable by 12 noon on Monday, to be paid by counsel, not by USAir.

Tr. 20–192. Counsel did not indicate any desire to present other witnesses or give other testimony. He did not suggest that he desired further opportunity to research the issue or suggest other concerns as to the procedural aspects of the imposition of the sanction.[8]

### D. Post Trial Submissions by Counsel

In conjunction with the now-withdrawn motion to rescind, Mr. Dombroff submitted an affidavit from local counsel, Richard Watson, Esquire. Mr. Watson noted that he has nearly twenty years experience as a lawyer in South Carolina and provided the following information:

> I personally participated in several aspects of [the USAir trial] including serving as "second chair" to Mark Dombroff, Esquire.... In the course of preparing for the liability trial, ... I received a telephone call from Tom Almy, Mr. Dombroff's law partner. He specifically inquired as to the interpretation of Federal Rule 615 which provides for the sequestration of witnesses. He asked me if in this

jurisdiction the Rule was interpreted as prohibiting the providing of "daily copy" ... to future witnesses. Without researching the issue, I advised him that I was unaware of any such prohibition.

Affidavit of Richard Watson.

### LEGAL STANDARD AND PROCEDURES

█ In imposing sanctions, this court incorrectly stated that the sanctions were being imposed for civil contempt. Civil contempt is normally imposed to coerce desired behavior, while criminal contempt is imposed to punish. *International Union, UMWA v. Bagwell*, 512 U.S. 821, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994). The sanctions here were criminal in nature because they were imposed to punish prior behavior.

█ Subject to certain procedural restrictions, this court has both the authority and the duty to control the conduct of trials before it through use of the contempt powers. The court may also rely on its inherent powers subject to similar safeguards. *See United States v. Shaffer Equipment Co.*, 11 F.3d 450 (4th Cir.1993).

> Due to the very nature of the court as an institution, it must and does have an inherent power to impose order, respect, decorum, silence, and compliance with lawful mandates. This power is organic, without need of a statute or rule for its definition, and it is necessary to the exercise of all other powers.

*Shaffer Equip. Co.*, 11 F.3d at 461 (*citing Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–44, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991)). This power clearly extends to controlling the behavior of counsel when a lawyer serves as an officer of the court. *Shaffer Equipment Co.*, 11 F.3d at 457 ("[l]awyers, who serve as officers of the court, have the first line task of assuring the integrity of the process").

Rule 42 of the Federal Rules of Criminal Procedure sets forth the appropriate procedures to be followed prior to the imposition

---

**8.** Mr. Dombroff had initially contended that it was plaintiffs, not USAir, that moved for sequestration. After the break, however, he conceded that both sides requested sequestration in their pretrial briefs.

of criminal contempt sanctions. The procedural safeguards applicable vary, depending on whether the conduct punished was direct or indirect.[9] Summary disposition is allowed only if "the judge certifies that the judge saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court." Fed.R.Crim.P. 42(a). In the present case, both instances of conduct occurred outside of the courtroom, and they were not observed personally by the court. Nonetheless, they were actions that related directly to an ongoing proceeding immediately before the court. *See generally United States v. Neal,* 101 F.3d 993 (4th Cir.1996) (discussed below).

By contrast, a number of procedural protections are imposed for conduct occurring outside the presence of court. Fed. R.Crim.P. 42(b). These protections include: notice stating "the time and place of hearing, allowing a reasonable time for the preparation of the defense, and [stating] the essential facts constituting the criminal contempt charged." The notice can be "given orally by the judge in open court in the presence of the defendant." *Id.* Other safeguards, such as a right to trial by jury as to certain offenses, would not be applicable in the present case.

The Fourth Circuit has recently addressed an additional procedural aspect of contempt proceedings in *United States v. Neal.* Specifically, the Fourth Circuit addressed whether a court is required to refer a matter to the United States Attorney, or other prosecutor, rather than addressing the matter itself. The Court of Appeals stated, as to indirect contempt, that "[w]hen the contumacious conduct at issue occurs out of the presence of the court or does not interfere with an ongoing proceeding immediately before the court,

the inherent contempt power does not permit a judge to dispense with a prosecutor altogether and fill the role himself." 101 F.3d at 997 (emphasis added). The court discussed, but rejected, a distinction made by the First Circuit, which has held that a "prosecutor need not be appointed for indirect criminal contempt proceedings if the evidence is so simple that the judge conducting the proceedings may remain an impartial fact finder." *Neal,* 101 F.3d at 998 (citing *In re Grand Jury Proceedings,* 875 F.2d 927, 934 (1st Cir.1989)). Ultimately, the Court of Appeals concluded that the district court committed plain error by taking on the role of investigator and prosecutor in determining that a witness had intentionally disobeyed a subpoena.[10]

Application of these requirements to the present facts is questionable given the manner in which the issues arose. The relevant facts were initially developed in an adversarial context between opposing parties in the context of determining whether to allow Captain Davidson to testify. The issue was discussed generally on the nineteenth day of trial, prompting the court to allow an evening deposition of Captain Davidson. The following day, the issues were discussed in great detail with the court ultimately concluding that Captain Davidson should be allowed to testify. *See generally* Tr. 20–133 to 20–154.

The underlying facts were not only fully developed in this adversarial context but were also essentially undisputed. Only after the court determined that Davidson's testimony should not be excluded as a sanction was the issue of other possible sanctions discussed.[11]

---

**9.** In his memorandum in support of his motion to rescind sanctions, USAir's counsel points out that the sanction was criminal in nature, rather than civil, because it was imposed to punish rather than to coerce. Nonetheless, USAir expressly declines to address "any procedural safeguards that may arise for certain kinds of criminal contempt." Memorandum at n. 2. USAir has also declined further procedural review suggested by the court in response to USAir's motion to rescind.

**10.** In *Neal,* the district court had itself selected three witnesses to call to address the challenged

conduct. The contempt-defendant apparently cross-examined these witnesses and testified on his own behalf but did not call other witnesses.

**11.** The question of whether alternative sanctions to excluding Davidson's testimony should be imposed arose, in part, in response to the following statement of defense counsel: "I would be yelling and screaming if I was on [plaintiffs'] side, and if you feel that I made an error, judge, if you feel I made an error here, it's not an error that you should charge against my client under these circumstances." Tr. 20–152.

Defense counsel filed a motion to rescind along with an affidavit. This court has considered those submissions and offered further opportunity to be heard which counsel has declined. Under these circumstances, this court determines that even if further hearing or outside prosecution would otherwise have been available, it has been waived.[12]

## DISCUSSION

### 1. Defense counsel should be sanctioned for providing daily transcripts to a fact witness in violation of the sequestration order.

■ Rule 615 of the Federal Rules of Evidence provides as follows: "At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses...." While there are various exceptions set forth in the rule, none are applicable here.

In the present case, both parties requested sequestration in their pretrial briefs. In addition, sequestration was orally requested by plaintiffs on the first day of trial. The court orally announced that fact witnesses would be sequestered and instructed counsel that the court would rely upon them to help enforce the rule in light of the fact that the trial attracted many spectators and the court would not, in most cases, be able to tell if a potential witness drifted into the courtroom. A discussion followed relating to expert witnesses. The court confirmed that expert witnesses would not be subject to the sequestration order. The parties also discussed who might sit as a representative party for USAir and, therefore, be exempt from the sequestration order. Tr. 1–29 to 1–30.

Clearly, under these undisputed facts, Mr. Dombroff was aware that all witnesses, not expressly exempted from the sequestration order, were excluded from the courtroom. The question then turns to whether counsel intended to violate the sequestration order

when he provided copies of daily transcripts to a fact witness likely to be called to impeach plaintiffs' expert witness on an issue of fact.

As the Fourth Circuit noted in *United States v. McMahon*, in upholding criminal contempt sanctions against a non-lawyer witness, "the conduct enjoined here [was] stunningly simple: prospective witnesses were barred from the courtroom. The interest protected was clear: 'to prevent the possibility of one witness shaping his testimony to match that given by other witnesses at the trial.'" 104 F.3d 638, 643 (4th Cir.1997) (quoting *United States v. Leggett*, 326 F.2d 613 (4th Cir.) *cert. denied* 377 U.S. 955, 84 S.Ct. 1633, 12 L.Ed.2d 499 (1964)).

In this case, as in *McMahon*, the purpose of reviewing the transcript was actually the converse: to allow the witness to "address the harmful testimony of other witnesses in order to undermine the [opposing party's] case and further [its own] cause." *McMahon*, 104 F.3d at 644 (internal quotations of district court opinion omitted). Clearly, as demonstrated by the Fourth Circuit's affirmation of sanctions in *McMahon*, any distinction between whether the purpose of the reading was to enable the witness to "match" testimony or to "undermine" testimony is of no consequence to the obvious impropriety of sharing transcripts with a sequestered fact witness.

As did the district court in *McMahon*, this court finds counsel's suggestion that he had no intent to circumvent the sequestration order to be "unworthy of credence" and his claim that he was not aware that an otherwise excluded witness could not read the daily transcripts to be "untenable." 104 F.3d at 644. If anything, the evidence of intentional violation of a court order is stronger in the present case than in *McMahon* because the person sanctioned in this case is a very experienced trial lawyer. *See* 104 F.3d at 643–44 (the district court noted that although

12. The Supreme Court has held that "[g]reater procedural protections are afforded for sanctions of indirect contempts." However, "certain indirect contempts are particularly appropriate for imposition through *civil proceedings*, including contempts impeding the courts ability to adjudi-

cate the proceedings before it and those contempts involving discrete, readily ascertainable acts." *International Union, UMWA v. Bagwell*, 512 U.S. 821, 822, 114 S.Ct. 2552, 2554, 129 L.Ed.2d 642 (1994) (emphasis added).

he was not a lawyer, "Defendant is no dummy; he is a highly successful real estate developer" with significant litigation experience).[13]

For the very same reason, this court rejects defense counsel's suggestions that this court should not impose sanctions either because *McMahon* was only recently decided or because this court did not draw the concern to counsel's attention prior to the eighth day of trial. The first argument is wholly frivolous. *McMahon* did not announce a new rule or interpretation. Rather, it imposed sanctions because of a violation so obvious that, in the opinion of the Fourth Circuit Court of Appeals, a layman should recognize it.

Likewise, the second argument is an offensive attempt to shift the blame to the court simply because it took a precautionary measure of bringing a recent decision relating to *witness* misconduct to counsel's attention.[14] To suggest that the court's failure to remind counsel of this obvious prohibition excuses counsel's behavior is, itself, inexcusable. The court has no duty to remind counsel of the obvious rules of court. If the court nonetheless does so, whether because of its observations of the manner in which trial is being conducted or otherwise, counsel should hardly be allowed to use such a reminder to insulate earlier violations from punishment.

As the Fourth Circuit stated in *McMahon:* "A trial court must be permitted to retain the ability to control the witnesses and litigants before it. Without that control, our system of justice would suffer." 104 F.3d at 645. Surely, the ability to control conduct is even more important when it comes to counsel who are, themselves, officers of the court.

This court also finds no excuse for Mr. Dombroff's behavior in his prior "consultation" with local counsel which, at most, indicates a very brief consultation in which local counsel was asked "if in this jurisdiction [Rule 615] was interpreted as prohibiting the providing of 'daily copy' ... to future witnesses." Local counsel states that "[w]ithout researching the issue, I advised him that I was unaware of any such prohibition." On its face, this statement is rather noncommittal. It does not assure inquiring counsel that the practice is permissible but instead seems only to disavow knowledge of any express local prohibition. Mr. Dombroff provides nothing to indicate that any further inquiry was made. Certainly none was made of the court despite numerous pretrial discussions, some of which were *in camera*, and innumerable pretrial hearings. This lack of further inquiry is most troubling in light of the clear subversion that such an interpretation would make of the obvious purpose of Rule 615. Indeed, this court cannot see how an attorney, who has himself invoked Rule 615, could possibly believe that sharing of daily transcripts did not violate the rule absent a clear judicial ruling that it did not.

Finally, the court must reject Mr. Dombroff's argument that he was candid with the court when the issue first arose on the eighth day of trial. The relevant portion of the colloquy is set out below:

> THE COURT: Let me just say, ... we [have] sequestered the witnesses, but y'all are requesting daily copy of the transcript, and maybe we ought to caution the parties

**13.** The decision in *McMahon* was not unanimous. In his dissent, Judge Michael focused on what he saw as the majority's melding of the requirements that the violation be willful and that the order be clear. His concern was as to the clarity of the order. To the extent these concerns were present in *McMahon*, they are less at issue here given that the offending party, an experienced trial attorney, was aware that Rule 615's exclusion had been invoked. In *McMahon*, it was only shown that *McMahon* was aware that the judge had ordered that *McMahon* would "have to leave the courtroom." Some of the sanctioned conduct included discussions with others who had legitimately been present in the courtroom regarding each days' events which,

Judge Michael notes, is more attenuated conduct than the sharing of transcripts and is, arguably, less obvious a violation. 104 F.3d at 646.

**14.** Daily transcripts were being prepared for counsel who might, quite legitimately, be sharing them with persons who were not subject to sequestration (*e.g*, non-witnesses, exempted expert witnesses or designated client representatives). The court's instruction was, in large measure, intended to insure that counsel safeguarded the transcripts from further dissemination that might lead to violation of the sequestration order. See quoted discussion in text. Tr. 8–26 to 8–27.

not to share those transcripts with witnesses to be called. [A]nd last night I took my fourth circuit advance sheets home and there was a case dealing with exactly that issue, that was in terms of a criminal case, where a witness was getting the daily transcripts brought to his office, and he was held in contempt for violating the sequestration order. But the point is, I think you ought not—both sides ought not share any transcripts with any witnesses.

MR. DOMBROFF: If it's been done, we will stop.

THE COURT: Well, I didn't mean it was but-

RAPOPORT: It raises a question about experts, though, since they have a right to see—

THE COURT: Well, the experts can see them.

MR.RAPOPORT: We're just strictly talking non-experts-

\* \* \*

MR. DOMBROFF: Well, we have been sharing them with our experts.

Tr. 8–26 to 8–27.

Mr. Dombroff's cryptic comment does not strike this court as candor. "The general duty in candor and truth thus takes its shape from the larger object of preserving the integrity of the judicial system." *Shaffer Equip. Co.,* 11 F.3d at 458. "Our adversary system depends on a most jealous safeguarding of truth and candor." *Shaffer Equip. Co.,* 11 F.3d at 463.

In short, contrary to providing an excuse for defense counsel's conduct, the inquiry to local counsel confirms the deliberateness of the behavior. Counsel would not have made the inquiry had he not been aware of a possible problem with use of transcripts.[15] This court, therefore, finds counsel's behavior, at best, to constitute a "studied ignorance." *See McMahon,* 104 F.3d at 644–45. "Although ignorance of the terms of a sequestration order would ordinarily preclude a finding of contempt, a person 'is not permitted to maintain a studied ignorance of the

terms of a decree in order to postpone compliance and preclude a finding of contempt.' " *Perfect Fit Indus. v. Acme Quilting Co.,* 646 F.2d 800, 808 (2d Cir.1981), *aff'd after remand,* 673 F.2d 53 (2d Cir.), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982).

Mr. Dombroff focuses his arguments on a variety of cases that address attenuated conduct such as prohibiting discussions or cohabitation between witnesses during a trial. *See Milanovich v. United States,* 275 F.2d 716 (4th Cir.1960) *affirmed in part and reversed in part on other grounds,* 365 U.S. 551, 81 S.Ct. 728, 5 L.Ed.2d 773 (1961). These cases are, however, inapposite. They do not deal with what is clearly at least the equivalent of the directly prohibited behavior: presence in the courtroom. Indeed, the opportunity to review daily transcripts is potentially more violative of the rule than actual presence in the courtroom for two reasons. First, it prevents detection of the witness who is subject to sequestration. Second, it provides an even better opportunity to "match" or "undermine" the testimony already provided because more of an opportunity is provided to study the precise words used by earlier witnesses. Similarly, none of Mr. Dombroff's cited cases deal with direct conduct of counsel facilitating a violation of the sequestration order.

Under these circumstances, this court can only conclude that Mr. Dombroff, a veteran trial lawyer, knowingly and intentionally violated the court's sequestration order. Sanctions are appropriate to punish and deter such conduct under both the contempt and inherent powers of this court.

2. ·**Counsel should be sanctioned for issuance of an invalid subpoena and related representations inducing the witness and his employer to believe that the subpoena was enforceable despite lack of proper service and issuance beyond the subpoena power of the court.**

■ The subpoena at issue was invalid for a number of reasons: it was sent by facsimi-

---

**15.** The court would further note that the affidavit gives very little detail as to precisely the nature of the inquiry to local counsel. For instance, was it

made clear that the transcripts would be provided to fact, rather than expert, witnesses?

le, not served; it was sent without a mileage or witness fee check; and it sought to compel attendance of a witness who was beyond the subpoena power of the court. Any experienced attorney would have been aware of these problems with the issuance of the subpoena. This court, therefore, finds that counsel knowingly issued an invalid subpoena to a witness who was beyond the subpoena power of the court.[16]

Further, the only reasonable conclusion from the record is that the subpoena was represented to the witness, expressly or by inference, to be valid. It is also quite apparent that the subpoena was given to the witness with the intent that he present the subpoena to his employer as a valid subpoena. Given these obvious conclusions, this court finds that the error in the issuance of the invalid subpoena was seriously compounded by representations, express or implied, that the subpoena was valid.[17]

An attorney issues a subpoena under his authority as an officer of the court. *See* Fed.R.Civ.P. 45. To knowingly abuse that power is an affront to the fair and impartial administration of justice and is subject to sanctions under the inherent power of the court.[18] The court finds, therefore, that the conduct at issue justifies imposition of a sanction and that the proper sanction is imposed under the contempt and inherent authority of the court.

**3. The Amount of the Sanction to be Imposed**

■ The court finds that the combined effect of presentation of a witness who has been provided transcripts in violation of a court order and who has been brought before the court under an invalid subpoena is an affront to the court's authority to properly manage the trial. The court finds that a fine in the amount of $1,000 for the combined effect of the above referenced conduct is appropriate.

**IT IS SO ORDERED.**

---

16. The service issue is the court's least concern because it is likely that some similar means of service could have been utilized with a valid acceptance of service form. Although defendant has not suggested that such a waiver of service was obtained, the record is not fully developed on this point. The court has, for these reasons, given this factor only minimal, if any, weight.

17. It also appears likely that defense counsel intended the witness to be able to buttress his credibility to the jury by stating that he had been compelled to testify by subpoena. The Court does not, however, make a finding in this regard as this issue was not sufficiently developed for the court to make a finding to the appropriate degree of certainty.

18. It would be an odd result indeed if the court had the power to exclude the witness altogether but not the ability to impose a lesser sanction in the form of a fine on counsel for the same conduct.